COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys,* Beales and Lorish
Argued at Richmond, Virginia

PUBLISHED

CARLOS IBANEZ, ET AL.

v.      Record No. 0951-22-2

ALBEMARLE COUNTY SCHOOL BOARD, ET AL.

OPINION BY
JUDGE LISA M. LORISH
FEBRUARY 20, 2024

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Claude V. Worrell, Judge

Vincent M. Wagner (Christopher P. Schandevel; David A. Cortman;
Tyson C. Langhofer; Ryan L. Bangert; Katherine L. Anderson;
Alliance Defending Freedom, on briefs), for appellants.

Jeremy D. Capps (David P. Corrigan; Melissa Y. York; M. Scott
Fisher; Blaire H. O'Brien; Harman, Claytor, Corrigan & Wellman,
on brief), for appellees.

Amicus Curiae: Melissa Moschella, Ph.D. (Melvin E. Williams;
Williams & Strickler, PLC, on brief), for appellants.

Amicus Curiae: Ian Rowe (William R. Thetford Jr.; Simms
Showers LLP, on brief), for appellants.

Amicus Curiae: The Family Foundation (William H. Hurd;
Annemarie DiNardo Cleary; Eckert Seamans Cherin & Mellott,
LLC, on briefs), for appellants.

In 2019, the Albemarle County School Board adopted the Albemarle County Public

Schools Anti-Racism Policy and a set of implementing regulations. The stated purpose of the

Policy was to "eliminate all forms of racism from the Division." A group of parents, on behalf

of themselves and their minor children then-enrolled in different grades and schools within

---

* Judge Humphreys participated in the hearing and decision of this case prior to the effective date of his retirement on December 31, 2023.

Albemarle County, allege that the Policy, and the curriculum implemented under the Policy, violates their rights under the Virginia Constitution and a Virginia statute. The circuit court found that the underlying constitutional and statutory provisions were not self-executing and dismissed their claims for lack of standing.

This case raises complicated issues and has generated three separate opinions. We unanimously agree with the circuit court that the statute Plaintiffs rely on, Code § 1-240.1, contains no waiver of sovereign immunity, and is, therefore, not self-executing. Contrary to the circuit court, we all find that the first paragraph of Article I, § 11, and all of § 12, are self-executing constitutional provisions within the Virginia Bill of Rights. Then, a majority of this panel concludes that Plaintiffs either failed to adequately plead cognizable constitutional injuries under those provisions, or otherwise lack standing to pursue their claims for declaratory relief. Judge Humphreys and I agree that Plaintiffs failed to sufficiently plead claims of compelled speech, alleged violations of equal protection and due process rights, and the asserted right to direct the education of children. Judge Beales and I agree that Plaintiffs failed to sufficiently plead the claim for viewpoint discrimination. In sum, a majority of this panel concludes that the circuit court was correct to dismiss each claim in the Complaint.

BACKGROUND

A group of parents ("Plaintiffs")[1] with minor children ("Students")[2] who were enrolled in the Albemarle County Public Schools filed a Complaint against the Albemarle County School Board ("Board"), Albemarle Schools Superintendent Matthew S. Haas, and Assistant Superintendent Bernard Hairston (collectively, "ACPS" or "Defendants"). Plaintiffs assert

---

[1] The parents are Carlos and Tatiana Ibanez, Matthew and Marie Mierzejewski, Kemal and Margaret Gokturk, Erin and Trent Taliaferro, and Melissa Riley.

[2] The Students were all enrolled in ACPS at the time the Policy was adopted and are identified as V.I., R.I., P.M., T.G., N.G., D.T., H.T., and L.R.

several constitutional violations on behalf of the Students, each stemming from the Board's decision to adopt the Policy in 2019. Plaintiffs also allege one constitutional violation and one statutory violation based on their status as parents.

We recite the facts as pleaded in the Complaint and its attachments. *Steward ex rel. Steward v. Holland Fam. Properties, LLC*, 284 Va. 282, 285 (2012); *see* Rule 1:4(i) ("The mention in a pleading of an accompanying exhibit, of itself and without more, makes such exhibit a part of the pleading."). While Defendants raised the issue of standing in a plea in bar, in their opening brief Plaintiffs limited our standing inquiry to only "the allegations in their complaint and the evidence attached to it . . . including the more complete versions . . . produced in response to Defendants' motion craving oyer." Thus, we do not review or consider the affidavits and other documents attached to Plaintiffs' motion for a preliminary injunction or to other filings after the Complaint.[3]

A. The Anti-Racism Policy

In 2019, the Board adopted the Policy, a copy of which is attached to the Complaint. The Policy states that the Board and ACPS "reject all forms of racism as destructive to the Division's mission, vision, values, and goals," and sets out principles of equality to which the Board committed itself. The "purpose" statement identifies "[c]ombating racism in our schools [as] a legal and moral imperative," and explains that within ACPS "there are significant disparities between racial groups in student academic performance, achievement, and participation in academic programs." The "purpose of this policy is to eliminate all forms of racism from the Division in conjunction with related Board policies."

---

[3] Our partially dissenting colleague Judge Beales discusses at length these affidavits and other materials that the Plaintiffs only rely on for their request for injunctive relief.

The Policy includes several definitions. "Anti-racism" is defined as "the practice of identifying, challenging, and changing the values, structures, and behaviors that perpetuate systemic racism." It also defines "[i]ndividual racism," "[i]nstitutional racism," and "[s]tructural (or systemic) racism."[4]

B. The Policy Regulations

Along with the Policy, the Board adopted Regulations, which are attached to the Complaint. The Regulations include directives about how the Policy should be communicated throughout the school system and how school leaders and administrators should address systemic racism. The Regulations also address how staff should be trained on the Policy and how the Policy would be enforced.

Under a section labeled "Curriculum and Instruction," the Regulations state, "Curriculum and instructional materials for all grades shall reflect cultural and racial diversity and include a range of perspectives and experiences, particularly those of historically underrepresented groups of color." In addition, "[a]ll curriculum materials shall be examined for racial bias," and "[t]he Board and Division shall implement an anti-racist curriculum and provide educational resources for students at every grade level." Finally, "[s]tudents in-class and extra-curricular programs and activities shall be designed to provide opportunities for cross-cultural and cross-racial interactions to foster respect for cultural and racial diversity."

---

[4] Individual racism is defined as "pre-judgment, bias, or discrimination by an individual based on race," including "both privately held beliefs, conscious and unconscious, and external behaviors and actions towards others." Institutional racism "occurs within institutions and organizations, such as schools, that adopt and maintain policies, practices, and procedures that often unintentionally produce inequitable outcomes for people of color and advantages for white people." And structural (or systemic) racism "encompasses the history and current reality of institutional racism across all institutions and society" and refers to "the history, culture, ideology, and interactions of institutions and policies that perpetuate a system of inequity that is detrimental to communities of color."

The "Policy Enforcement" portion states that staff shall be responsible for collecting, reviewing, and reporting data "regarding racial disparities" in various areas across the school system. The enforcement section also assigns responsibility to the "assistant superintendent for school and community empowerment" to implement and evaluate the Policy. Finally, the section tasks the Division with ensuring that there are means for students and staff to report racism and forms of discrimination. There is no mention of disciplinary action of any kind under the "Policy Enforcement" section of the Regulations.

Instead, under the "Leadership and Administration" section, the Regulations state that "[t]he Board shall implement alternative discipline processes, such as restorative justice, to reduce racial disparities in discipline and suspension." They then explain:

> a. To ensure consistency in student discipline, each school shall collect and, at least annually, report data on all disciplinary actions. The data shall include the student's race/ethnicity, gender, socio-economic status, special education, and English Language Learner status, as well as a written explanation of the behavior leading to discipline and the specific corrective action taken.
> b. When school administrators determine a student has committed a racist act, the student will be provided the opportunity to learn about the impact of their actions on others through such practices as restorative justice, mediation, role play or other explicit policies or training resources.

Plaintiffs allege on information and belief that, under subparagraph (b), "other explicit policies" refers to the ACPS Student Conduct Policy, which "establishes a sliding scale of discipline" including "in-school suspension" and ultimately "expulsion." The ACPS Student Conduct Policy was not attached to the Complaint, nor is it referenced anywhere in the Policy or Regulations. Plaintiffs do not allege that a child has faced discipline under the ACPS Student Conduct Policy for violating the Policy—or that any student has received a "learning opportunity" under the Policy or Regulations.

C.  Teacher and Staff Training on the Policy

Teachers and staff underwent mandatory orientation and training to implement the goals of the Policy.  The online orientation presented the Policy's definitions of "racism" and "anti-racism" and showed a video excerpt from an interview with Ibram X. Kendi discussing his book *How to Be an Anti-Racist*.  It also included a video-recorded statement of the school system's assistant superintendent explaining the concept of anti-racism.  Another online professional development course presented months later featured a session entitled, "Becoming an Anti-Racist School System: A Courageous Conversation," with Glenn Singleton, the author of *Courageous Conversations About Race: A Field Guide for Achieving Equity in Schools* (2d ed. 2014).  Slides featured in a presentation based on Singleton's book, presented only to teachers and staff, discussed race consciousness, described sociological research about general differences between how white people and people of color communicate, and explained the concept of white privilege.  A reference packet for teachers and staff distinguished "passive racism" and "active racism" and provided examples.  The packet also included suggestions of things "white people who are sincerely working on their white privilege" might want to avoid saying.  Copies of these materials are attached to the Complaint.

D.  The Pilot Program and Broader Anti-Racist Curriculum

The Policy and Regulations state that ACPS plans to implement an anti-racist curriculum throughout the school system.  The Complaint alleges that "under 'anti-racist' teaching, 'racism' no longer is discrimination involving acts by one person against another based on the victim's race."  Instead, "'racism' is defined first by membership in one racial group ('white')" and "[f]ailure by members of that group to confess their racial guilt and to pledge absolute allegiance to an ideology that denigrates them based on their race constitutes 'racism.'"

In spring 2021, ACPS began a Pilot Program to incorporate anti-racist education at Henley Middle School. Eighth-grade teachers were provided with prepared slides ("Pilot Program Slides," attached to the Complaint) and notes for lessons to implement "antiracist" work with the students. Students could opt out of participating in this Pilot Program. Only the son of Plaintiffs Marie and Matthew Mierzejewski "saw some of the curriculum's content after the program started," before they pulled him from participating in the program. The Complaint does not allege that he suffered any adverse consequence from withdrawing. None of the other Students were in eighth grade at Henley during the Pilot Program.[5]

Plaintiffs allege that the content from the Pilot Program has already spread throughout ACPS as part of the broader curriculum, as called for by the Policy and Regulations, and that Defendants intend to take further steps to continue implementing the same material throughout the school system. As we discuss below, we assume without deciding that Plaintiffs sufficiently pleaded this, including the claim that the material will be so pervasive that opting out is impossible. Thus, we examine Plaintiffs' specific allegations about the content of the Pilot Program Slides, as well as the slides themselves, as reflective of the curriculum Students will experience in the future.

Plaintiffs allege that the Pilot Program Slides "sought to indoctrinate students in racial stereotypes and treated students differently based on race," and "to indoctrinate students into a particular political viewpoint on race." Plaintiffs allege that the Pilot Program Slides "redefined 'racism' in a way that treated students differently based on race and necessarily set students with different skin colors at odds with each other," by defining "racism" as "[t]he marginalization and/or oppression of people of color based on a socially constructed racial hierarchy that

---

[5] The Complaint does not contain any allegations about the content of the separate curriculum for the seventh graders in the Pilot Program.

privileges white people."[6]  According to Plaintiffs, such a definition "not only explicitly treats students differently based on race, but it also endorses and perpetuates racial stereotypes."

Plaintiffs also allege that these Pilot Program Slides commanded certain speech and action and also chilled nonconforming speech and action.  The slides, Plaintiffs allege, taught that concepts such as "'colorblindness,' claiming we live in a 'post racial society,' asserting that '[i]t doesn't matter who you vote for,' . . . 'claiming reverse discrimination,'" "'denial of white privilege,' 'remaining apolitical,' [and] believing that 'we all belong to the human race,'" are all examples of "racism."  Plaintiffs also allege that the Pilot Program taught that "taking certain positions on such controversial political issues as school funding, immigration policy, and criminal justice reform" could also "constitute racism and must be contested for one to be 'anti-racist.'"  In sum, Plaintiffs allege the Pilot Program Slides "instruct[] white students that if they fail to adopt and forcefully advance a radical ideological political program, they are racist, *regardless* of whether they individually harbor any racial animus or bias."

According to Plaintiffs, ACPS required students to take certain positions and assert certain beliefs they may not agree with because the Pilot Program Slides taught that "[b]eing anti-racist is fighting against racism," and requires a "conscious decision to make frequent, consistent, equitable choices daily," and without such "anti-racist choices, we (un)consciously uphold aspects of white supremacy, white-dominant culture, and unequal institutions and society."  The Pilot Program Slides also included space for students to reflect on how they could "look," "think," "sound," and "act" more "anti-racist."  Plaintiffs allege that a student's failure to participate in these activities, or to speak or act consistently with the Pilot Program Slides, is punishable under the School Conduct policy.

---

[6] The relevant slide attributes this definition of racism to the "ADL" or the Anti-Defamation League.

Plaintiffs attached to the Complaint the slides corresponding to these allegations. One contains the statements: "This list shows how our personal bias and our inaction toward racism can uphold a racist system" and "Racism is not just the big things. It is the little things, too!" On the same slide is the following pyramid, which contains the phrases that—if uttered—the Complaint alleges would constitute a "racist act" subject to discipline:



The other slides the Complaint highlights include:





Plaintiffs also allege the Pilot Program Slides treated students differently based on race and religion. They allege that the slides taught students that the "dominant culture" was made up of "white, middle class, Christian, and cisgender" individuals but that "Black, brown, indigenous people of color of the global majority, queer, transgendered, non-binary folx, cisgender women, youth, Muslim, Jewish, Buddhist, atheist, non-Christian folx, neurodiverse, folx with disabilities,

folx living in poverty" were part of the "subordinate culture." The corresponding slide contained the following text, with suggested teacher notes underneath:



DOMINANT CULTURE: White, upper-middle class, cisgender male, educated, athletic, neurotypical, able-bodied
SUBORDINATE CULTURE: Black, brown, indigenous people of color of the global majority, queer, transgendered, non-binary folx, cisgender women, youth, Muslim, Jewish, Buddhist, atheist, non-Christian folx, neurodiverse, folx with disabilities, folx living in poverty

A separate slide explained that "dominant culture" comprised "the group of people in society who hold the most power and are often (but not always) in the majority" and the group that was "in charge of institutions and have established behaviors, values, and traditions that are considered acceptable and the 'norm' in our countries." Plaintiffs allege based on these same slides that the Pilot Program "encouraged students to consider their own 'privilege or lack of privilege'" and "suggested that being Christian or male, among other things, would not make a student's life harder, but being non-Christian or female would."

E. Plaintiffs' Complaint

The Complaint relies on the facts and allegations stated above, which were set out in the Complaint itself and in the accompanying attachments. In sum, the Complaint alleges that

- 11 -

"while Plaintiff parents and students applaud and agree with Defendants' stated desire to eliminate racism, Plaintiffs oppose the Policy, Regulations, and related practices advanced by Defendants because those materials perpetuate racism rather than combat it."

Plaintiffs bring five causes of action on behalf of Students under Article I, §§ 11 and 12 of the Virginia Constitution.[7] Plaintiffs allege that Defendants violated Students' rights to freedom of speech by engaging in unconstitutional viewpoint discrimination and compelling student speech, violated their rights to due process, and violated their rights to be free from governmental discrimination on the basis of race and religion. Plaintiffs also asserted a cause of action on their own behalf, alleging a breach of their parental rights under Article I, § 11 of the Virginia Constitution and under Code § 1-240.1. Plaintiffs sought various remedies for the alleged violations, including declaratory and injunctive relief to prevent future harm. Plaintiffs also filed a motion for a preliminary injunction. In response, Defendants demurred, alleging that the constitutional and statutory provisions on which Plaintiffs relied were not self-executing and that even if they were, Plaintiffs failed to state claims under any of the provisions. Defendants also filed a plea in bar raising the defense of sovereign immunity and alleging that Plaintiffs lacked standing to sue.

During a hearing on the motions, the circuit court explained that Plaintiffs did not have a "cognizable remedy of law because the Albemarle County School Board doesn't exist to create a curriculum that's particular as to any particular student." The court also stated that, under Plaintiffs' theory of the case, the school district would have the responsibility "to create an individualized education plan for every student" and that "every educational opportunity" would need to be cultivated "with the mind[set] that we don't want this student to be made to feel

---

[7] Under Code § 20-88.45, a "minor parent, or a guardian or legal representative of a minor parent, may maintain a proceeding on behalf of or for the benefit of the minor's child."

uncomfortable or be pushed to think beyond what we think or the parents think are the logical limits of this child's civic, emotional, religious, whatever other engagement with his community or her community."  The circuit court entered a final written order following the hearing, holding that "Plaintiffs lack standing to bring their claims, and that Plaintiffs have not stated a cause of action arising under Virginia law because their claims under the Constitution are not self-executing and the statute on which they rely does not create a private cause of action."  The order sustained the plea in bar, sustained the demurrer as to Plaintiffs' claim under Code § 1-240.1, and dismissed the Complaint with prejudice.  Plaintiffs appeal.

ANALYSIS

We agree with the circuit court's bottom-line conclusion but arrive by a different path.[8] The circuit court dismissed the Complaint after concluding the specified provisions of the Virginia Constitution were not self-executing.  We disagree and conclude that these provisions are self-executing.  Yet we find that for some claims, Plaintiffs fail to sufficiently allege a constitutional injury and that, for others, Plaintiffs lack standing because the injuries they allege will occur in the future are too speculative.

A.  Article I, §§ 11 and 12 of the Virginia Constitution are self-executing; Code § 1-240.1 is not.

Plaintiffs bring five constitutional claims under the Virginia Constitution's Bill of Rights. First, Plaintiffs assert violations of their rights to freedom from governmental discrimination on

---

[8] "Under the right-result-different-reason principle, an appellate court 'do[es] not hesitate, in a proper case, where the correct conclusion has been reached but [a different] reason [is] given, to sustain the result [on an alternative] ground.'"  *Vandyke v. Commonwealth*, 71 Va. App. 723, 731 (2020) (alterations in original) (quoting *Banks v. Commonwealth*, 280 Va. 612, 617 (2010)).  I use "we" throughout this opinion because while there are three separate opinions, at least one of my colleagues agrees with me that the circuit court was correct to dismiss each cause of action.

the basis of race and religion, to due process, and the right of parents to control the education of their children under the first paragraph of Article I, § 11, which states:

> That no person shall be deprived of his life, liberty, or property without due process of law; that the General Assembly shall not pass any law impairing the obligation of contracts; and that the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged, except that the mere separation of the sexes shall not be considered discrimination.

Plaintiffs also assert violations of their right to freedom of speech, including both the freedom against compelled government speech, and the freedom from viewpoint discrimination, under Article I, § 12:

> That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people peaceably to assemble, and to petition the government for the redress of grievances.

Plaintiffs argue that they may bring direct action against ACPS, a government entity, under these provisions even though no legislation creates causes of action for private plaintiffs to assert these rights. In other words, Plaintiffs argue that these provisions are "self-executing."

In general, a sovereign entity like Virginia "cannot be sued in its own courts . . . without its consent and permission." *Gray v. Va. Sec'y of Trans.*, 276 Va. 93, 101 (2008) (quoting *Bd. of Pub. Works v. Gannt*, 76 Va. 455, 461 (1882)). "And because the Commonwealth can act only through individuals," the doctrine of sovereign immunity "applies not only to the state, but also to certain government officials." *Id.* This generally includes school boards, *Kellam v. Sch. Bd. of City of Norfolk*, 202 Va. 252, 254 (1960), and school officials acting in their official capacities, *Banks v. Sellers*, 224 Va. 168, 170-73 (1982). But the Commonwealth can waive sovereign immunity and consent to suits in its own courts where statutory language "explicitly

- 14 -

and expressly," allows a private right of action and where a constitutional provision is "self-executing." *Gray*, 276 Va. at 102.

A constitutional provision is always self-executing when it expressly says as much. *Robb v. Shockoe Slip Found.*, 228 Va. 678, 681-82 (1985). Even without such a declaration, our Supreme Court has found provisions of the Virginia Constitution to be self-executing if they (1) are in the Bill of Rights (Article I of the Virginia Constitution), (2) declare common law, (3) are prohibitory or negative in character, or (4) provide a sufficient rule to protect or exercise the right without additional legislation. *Id.*

Applying these considerations, the Supreme Court has consistently found provisions in the Bill of Rights to be self-executing. In *Gray*, the Court found Article I, § 5—in relevant part, "That the legislative, executive, and judicial departments of the Commonwealth should be separate and distinct"—to be self-executing because it is in the Bill of Rights and "no additional legislation is needed to carry into effect [its] clear mandate." 276 Va. at 105. Likewise, Article I, § 14—"That the people have a right to uniform government; and, therefore, that no government separate from, or independent of, the government of Virginia, ought to be erected or established within the limits thereof"—is self-executing because it is in the Bill of Rights, is stated in the negative, and because the negative prohibition did not require legislation to make it operative. *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 281 Va. 127, 138 (2011). Finally, the portion of Article I, § 11 that provides private property shall not be taken without just compensation has repeatedly been found to be self-executing for property owners bringing inverse condemnation actions. *See, e.g.*, *Bell Atlantic-Virginia, Inc. v. Arlington Cnty.*, 254 Va. 60, 62 (1997); *AGCS Marine Ins. Co. v. Arlington Cnty.*, 293 Va. 469, 477 (2017).

In contrast, the Supreme Court has determined that various provisions outside the Virginia Bill of Rights are not self-executing, and thus do not convey a private right of action. In

*Robb* itself, the Court found that Article XI, § 1—"[I]t shall be the policy of the Commonwealth to conserve, develop, and utilize its natural resources . . . [and] to protect its atmosphere, lands, and waters from pollution, impairment, or destruction, for the benefit, enjoyment, and general welfare of the people of the Commonwealth"—was not self-executing because it "contains no declaration of self-execution, it is not in the Bill of Rights, it is not declaratory of common law, and it lays down no rules by means of which the principles it posits may be given the force of law." 228 Va. at 682.

Under the *Robb* factors, the first paragraph of § 11 and the entirety of § 12 are self-executing. Both are found in our Bill of Rights. Both are negative prohibitions: the first paragraph of § 11 prohibits the government from discriminating on the basis of certain characteristics and also prohibits government from depriving citizens of life, liberty, or property without due process of law, and § 12 prohibits the restraint and abridgement of the freedom of speech and freedom of the press. As for whether the provisions supply clear rules, courts have generally had no trouble interpreting similar provisions found in the Constitutions of the United States and our sister states. Finally, we observe that Virginia courts have historically addressed claims against government defendants based on Article I, §§ 11 and 12 on the merits. *See, e.g.*, *Wilkins v. West*, 264 Va. 447, 466-67 (2002) (resolving the merits of a discrimination claim against government defendants "solely under Article I, § 11 of the Constitution of Virginia" and stating the Court's expectation that other § 11 discrimination claims will follow); *Vlaming v. West Point Sch. Bd.*, ___ Va. ___ (Dec. 14, 2023) (reversing a demurrer for claims brought under Article I, §§ 11, 12, and 16 of the Virginia Constitution and thus implicitly finding them to be self-executing); *Richmond Newspapers, Inc. v. Commonwealth*, 222 Va. 574, 588 (1981)

(resolving the merits of a freedom of press claim under Article I, § 12 of the Virginia

Constitution).[9]

In holding today that these constitutional provisions are self-executing, we do not reach

whether these provisions support claims for money damages, which Plaintiffs seek along with

declaratory and injunctive relief.  Because we ultimately find that Plaintiffs' claims fail for other

reasons, we reserve this difficult question for a future case.

Finally, we affirm the circuit court's dismissal of Plaintiffs' statutory claim asserting

rights against the Commonwealth because Code § 1-240.1 is not self-executing.  The statute

provides, "A parent has a fundamental right to make decisions concerning the upbringing,

education, and care of the parent's child."  Code § 1-240.1.  Our Supreme Court has made it

abundantly clear that "[a] waiver of sovereign immunity will not be implied from general

statutory language but must be explicitly and expressly stated in the statute."  *Alliance to Save*

*the Mattaponi v. Commonwealth Dep't of Envtl. Quality ex rel. State Water Control Bd.*, 270 Va.

423, 455 (2005).  Code § 1-240.1 lacks an explicit or express waiver of sovereign immunity.

B.  Each of Plaintiffs' claims fail for failure to state a claim or because their feared future
injuries are so speculative that they lack standing.

Because Article I, §§ 11 and 12 are self-executing, private citizens may sue the

Commonwealth for violating those constitutional rights—so long as they sufficiently plead that

specific violations have occurred, or are likely enough to occur.  We review both whether a

plaintiff has standing to raise a claim (raised here in a plea in bar), and whether a claim has been

adequately stated (raised here by demurrer), de novo.  *See, e.g.*, *Givago Growth, LLC v. iTech*

*AG, LLC*, 300 Va. 260, 264 (2021) (holding that a demurrer arguing that a complaint has failed

to state a claim presents a pure question of law reviewed de novo); *Massenburg v. City of*

---

[9] In these cases, no claim of sovereign immunity was raised; as such, the Supreme Court
did not evaluate whether the provisions were self-executing.

*Petersburg*, 298 Va. 212, 216-17 (2019) (explaining that appellate review of a plea in bar is "functionally de novo review").

We are limited here to the Complaint and the documents attached to it. This is always true when we review a demurrer raising a failure to state a claim because such a demurrer examines whether the "complaint states a cause of action upon which the requested relief may be granted." *Dye v. CNX Gas Co.*, 291 Va. 319, 323 (2016). "No court can base its decree upon facts not alleged, nor render its judgment upon a right, however meritorious, which has not been pleaded and claimed." *Potts v. Mathieson Alkali Works*, 165 Va. 196, 207 (1935). While the question of standing was raised in a plea in bar, Plaintiffs limited our inquiry into standing by making plain in their opening brief that they "rely only on the allegations in their complaint and the evidence attached to it . . . including the more complete versions [of those same attachments that were] . . . produced in response to Defendants' motion craving oyer." "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 518 (1975). As the burden belongs to Plaintiffs, not this Court—and Plaintiffs argue they met this burden from the Complaint and the complete versions of the documents they attached to the Complaint—we will not imagine or piece together an injury sufficient to create standing based on additional materials attached to other pleadings filed in connection with their request for injunctive relief.

Having established that our review is de novo, and limited to the complaint and the complete versions of the documents attached to it, "we accept on appeal the facts alleged in [a] complaint as true and draw any reasonable inferences from those facts in [the plaintiff's] favor." *Vlaming*, ___ Va. at ___. There are, however, limits to this basic principle. We "distinguish allegations of historical fact from conclusions of law." *Coward v. Wellmont Health Sys.*, 295 Va.

351, 359 (2018). "We assume the former to be true *arguendo*, but we assume nothing about the correctness of the latter because 'we do not accept the veracity of conclusions of law camouflaged as factual allegations or inferences.'" *Id.* (quoting *AGCS Marine Ins.*, 293 Va. at 473). In addition, we may "ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are a part of the pleadings.'" *Dodge v. Trustees of Randolph-Macon Woman's Coll.*, 276 Va. 1, 5 (2008) (quoting *Ward's Equipment, Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 382 (1997)).

Finally, in conducting our review, we recognize that Plaintiffs have alleged that constitutional harms have already occurred, that they are ongoing, and that they will continue absent declaratory relief. "A plaintiff has standing to bring a declaratory judgment proceeding if he has a justiciable interest in the subject matter of the litigation." *Cupp v. Bd. of Supervisors of Fairfax Cnty.*, 227 Va. 580, 590 (1984) (internal quotation omitted). A valid claim must generally be "based upon present rather than future or speculative facts." *Lafferty v. Sch. Bd. of Fairfax Cnty.*, 293 Va. 354, 361 (2017) (internal quotation omitted). We assume here, without deciding, that Plaintiffs have sufficiently alleged that the material from the Pilot Program Slides will be spread throughout the school system. In other words, while only one Student was part of the Eighth Grade Pilot Program before withdrawing, we assume that all Students would be subject to the same kind of instruction in the future through the broader curriculum. Given this assumption, we limit our review to whether future exposure to that curriculum would violate any Student's constitutional rights. If it would not, then Plaintiffs lack standing to pursue declaratory relief because they have not presented facts demonstrating "a 'substantial risk' that the [feared] harm will occur." *Morgan v. Bd. of Supervisors of Hanover County*, ___ Va. ___, __ (Feb. 2, 2023).

1. In generally asserting "governmental discrimination," Plaintiffs fail to allege facts to support their claim that ACPS has *treated*, or is *likely to treat*, any one differently based on their race or religion.

Plaintiffs allege that ACPS violated, and will continue to violate, their rights of freedom from governmental discrimination under Virginia Constitution Article I, § 11—protecting "the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin"—because the Policy and curriculum treat students differently based on race and religion.[10] Our Virginia Supreme Court recently explained that in "interpreting and applying" this provision, "we review, as persuasive (but not binding) authority, United States Supreme Court opinions construing the latter," as the "protections of Article I, Section 11 are at least as strong as the existing understanding of procedural due-process rights secured by the United States Constitution." *Vlaming*, ___ Va. at ___. As Plaintiffs here have not advanced any argument for a broader interpretation based on "its specific text and historical context," *id.* at ___, we rely on what is required to state a claim for a violation of the Equal Protection Clause of the Federal Constitution.[11]

_____

[10] Plaintiffs do not argue that the Policy or curriculum violates their right to the free exercise of religion under Article I, § 16 or the Federal Constitution. Nevertheless, my partially dissenting colleague Judge Beales discusses cases applying the federal Free Exercise Clause at great length, and suggests that pleading any failure to "treat religions neutrally" is sufficient to plead an equal protection violation. This blurs two distinct doctrines. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022) ("[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"). Plaintiffs have not pleaded that ACPS prohibited them from the free exercise of their religion, from engaging in any religious conduct, or that they were refused an accommodation to protect their religious liberty; instead, they only pleaded that the Policy violates their rights against discrimination.

[11] In an effort to leverage the recent language in *Vlaming* interpreting Virginia's free exercise clause, our partially dissenting colleague, Judge Beales, views Plaintiffs' equal protection argument "through the prism of the Virginia Constitution's role in preserving citizens' religious freedom" and finds that Virginia's equal protection and free exercise clauses are "complementary to each other, and the rights protected in one are supportive of the similar rights in the other section that also protect the individual's right to hold and exercise sincerely held

That clause commands that similarly situated persons be treated alike. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a claim for the violation of this right, a plaintiff must plead that "he has been treated differently from others with whom he is similarly situated" and that the differential treatment was intentional. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Assuming a plaintiff has satisfied these requirements, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* At this stage, we are concerned only with whether Plaintiffs have pleaded enough bare facts to fit the framework of a differential treatment claim to allow possible relief for a past violation, or to state a justiciable controversy to allow for declaratory relief to prevent a future harm.

As for discrimination on the basis of religion, Plaintiffs allege that the "curriculum discriminates by teaching that Christianity is a 'dominant' 'identity' that has oppressed 'subordinate' 'identities' such as Islam, Buddhism, Judaism, other non-Christian religions, and atheism." Plaintiffs also allege that the "curriculum discriminates against Christians by identifying them as 'dominant' and an 'identity' for others to work against" and instructing them "to make daily choices to work against 'dominant' 'identities' such as Christianity."

Turning to discrimination on the basis of race, Plaintiffs allege that "materials used by Defendants explicitly promote race-based discrimination" and that "the curriculum itself stereotypes and denigrates students based on their race," creating a "racially hostile educational

---

religious beliefs." In contrast with this careful recasting, Plaintiffs merely argue that Article I, § 11 "is 'congruent with the federal equal protection clause'" and that "courts apply 'the standards and nomenclature developed under' that clause." (quoting *Wilkins*, 264 Va. at 467). Driving home the limited nature of Plaintiffs' arguments, they did not argue, or even suggest, that *Vlaming* had any relevance to their equal protection claim in their Notice of Supplemental Authority alerting this Court to the issuance of that decision. "[I]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention . . . the issue is waived." *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017).

- 21 -

environment." They allege that the "inculcation of racial stereotypes, denigrating and hostile characterization of students based on race and practice of treating students differently based on race" is "differential treatment."

The core of a discrimination claim is differential treatment, and Plaintiffs point to many documents to try to turn differential government messaging into differential treatment. Because we only accept factual allegations as true where they are not "contradicted by the terms of authentic, unambiguous documents that properly are a part of the pleadings," *Dodge*, 276 Va. at 5, we look to these documents that Plaintiffs attached to the Complaint.

We begin with the Policy itself, which states that the Board and ACPS "reject all forms of racism." The Policy specifically identifies the existence of race-based disparities within the school system that it seeks to reduce and ultimately eliminate: (1) "disparities between racial groups in student academic performance, achievement, and participation in academic programs," (2) "disparities in graduation rates, gifted identification, course participation, special education identification, standardized test scores, and suspension rates," and (3) "[d]isparities . . . between the racial demographics of the students in the Division and the staff the Division hires." The Complaint does not identify any language in the Policy that directs students to be treated differently based on race or religion, and we find none. Instead, the Policy directs that disparities between different racial groups should be reduced and eliminated. The Regulations that implement the Policy are also "designed to dismantle the individual, institutional, and structural racism that exists in the Division."

Without any language or directives that students of different races or religions be treated differently, Plaintiffs focus on curriculum. Here, Plaintiffs cite to particular slides to support the allegation that the curriculum treats, and will continue to treat, Students differently on the basis of religion and race.

- 22 -

Comparing the allegations to the actual Pilot Program Slides, we find that Plaintiffs have pleaded that the curriculum taught the existence of racial and religious distinctions, but not that any differential treatment has occurred to date, or is sufficiently likely to occur. For example, Plaintiffs repeatedly allege that the Pilot Program taught that Christianity is a "dominant" "identity" and that Christianity has oppressed "subordinate" "identities" such as "Islam, Buddhism, Judaism, other non-Christian religions, and atheism."[12] Plaintiffs also allege that the "curriculum instructs students to make daily choices to work against 'dominant' 'identities' such as Christianity." But Plaintiffs do not allege that ACPS took actions against members of "dominant identities" or treated them differently in any way. Perhaps the Policy and curriculum could lead to a future circumstance where ACPS treats an individual student differently based on their race or religion—but at this point the concern is only speculative.[13] To support this aspect of the claim, Plaintiffs rely on no more than hypothetical future scenarios that amount to

---

[12] The slides from the Pilot Program defined "dominant culture" as "the group of people in society who hold the most power and are often (but not always) in the majority" and the group that was "in charge of institutions and have established behaviors, values, and traditions that are considered acceptable and the 'norm' in our countries."

[13] The Complaint alleges that Plaintiff Melissa Riley was concerned when she learned about the Pilot Program curriculum and approached the teacher with concern that her biracial son, L.R., would be in a "classroom with mostly white students" during the seventh-grade Pilot Program instruction. The Complaint further alleges that this teacher said the school "planned to create a 'safe space' for students of color" who wanted to be "separate from white students in the advisory classes where the pilot program would be taught." This statement from one teacher, who is not alleged to have any policy-making authority, discussed possible future actions that might be implemented during the Pilot Program. But while L.R. is alleged to have participated in the seventh-grade version of the Pilot Program, the Complaint does not state that he was ever segregated or separated from the class on the basis of his race during that program. In addition, while we accept as true that the curriculum represented in the Pilot Program Slides exemplifies the type of curriculum that would be implemented through ACPS, Plaintiffs have not alleged that the material would be delivered in exactly the same way in the future. Thus, this single mention of a possible future plan to separate students within a voluntary Pilot Program—that is not alleged to have taken place during L.R.'s participation in that program—is too speculative to state a justiciable controversy to allow for declaratory relief.

- 23 -

"[g]eneral distress over a general policy [which] does not alone allege injury sufficient for standing." *Lafferty*, 293 Va. at 361-62.[14]

Disparate treatment is the cornerstone of an equal protection claim. Plaintiffs have failed to plead that any of the Students received differential treatment on the basis of their race or religion under the Policy or curriculum, or that they are likely to be treated differently in the future. Whereas "the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices," *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018), "the gravamen of an equal protection claim is differential governmental treatment, not differential governmental messaging," *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017). *See also, e.g.*, *Carroll v. Nakatani*, 342 F.3d 934, 946 (9th Cir. 2003) ("Being subjected to a racial classification differs materially from having personally been denied equal treatment . . . . [Plaintiff] does not cite, and we do not find, any authority supporting the proposition that racial classification alone amounts to a showing of individualized harm."); *Moore*, 853 F.3d at 249 (dismissing equal protection challenge to display of Mississippi state flag brought by African-American attorney because he had pleaded only that flag subjected him to discriminatory messaging and not that he was "personally subjected to discriminatory treatment"); *New Doe Child #1 v. Congress of United States*, 891 F.3d 578 (6th Cir. 2018) (dismissing claim that "In

---

[14] Our partially dissenting colleague, Judge Beales, cites Plaintiffs' allegation that the "curriculum's foundational definition of racism applies unequally to students depending on the student's race" as evidence that the Policy treats students differently based on race. Because the underlying documents attached to the Complaint show that the same material and definitions were used across the curriculum regardless of the race of the students, we respectfully disagree.

God We Trust" inscription on currency violated equal protection rights as one of "differential government messaging" and not disparate treatment).[15]

A federal district court recently applied these same principles to conclude that plaintiffs challenging the decision by the Mayor of Washington D.C. to paint a large mural on the streets of the city stating, "BLACK LIVES MATTER," had failed to plead an equal protection violation. *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 228-29 (D.D.C. 2020). There, plaintiffs alleged that the mural "offends them and makes them feel like 'second class citizens'" and that the mural "gives the impression that the favored race of the District of Columbia are liberal citizens with black skin pigmentation." *Id.* at 227. Concluding that "at most" plaintiffs alleged the mural was "painful, threatening, and offensive" and that "[t]hey may, indeed, be subject to a discriminatory message every time they see the Mural," the court nevertheless found the complaint lacked any allegation that the "Mayor or the District ha[d] subjected them to any discriminatory *treatment* because of their race." *Id.* at 228-29.

With no differing treatment, Plaintiffs allege that "the curriculum itself stereotypes and denigrates students based on their race," creating a "racially hostile educational environment." This "inculcation of racial stereotypes [and] denigrating and hostile characterization of students based on race," Plaintiffs allege, is likely to result in differential treatment. In support, Plaintiffs

---

[15] Many other courts have reached the same conclusion that discriminatory treatment is a necessary prerequisite to an equal protection violation. *See Rainbow/PUSH Coal. v. F.C.C.*, 396 F.3d 1235, 1241 n.6 (D.C. Cir. 2005) (plaintiffs' claim that alleged racial discrimination in hiring at a university harmed local minority residents because it created the impression that the university did not care about discrimination was not a cognizable equal protection claim without showing of unequal treatment); *Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 596 (10th Cir. 1996) (exposure to alleged discriminatory advertisement was insufficient for an equal protection claim because it only gave rise to an "abstract stigmatic injury"); *Kurtz v. Baker*, 829 F.2d 1133, 1141 (D.C. Cir. 1987) (refusal of U.S. Congress chaplains to invite atheists to deliver remarks during morning prayer period of Congressional sessions did not violate equal protection because plaintiff merely alleged stigmatization of his beliefs rather than the denial of a benefit).

point to various materials that they allege trained teachers to treat students differently and to teach in a way that will create a hostile environment.

Virginia courts have yet to consider what is required to state a claim that a "hostile educational environment" violates equal protection rights. In general, federal courts considering the same question have explained that a claim of a hostile educational environment[16] "requires evidence not only that the victim subjectively perceived the environment to be hostile or abusive, but also that the environment was objectively hostile and abusive, that is, that it was 'permeated with "discriminatory intimidation, ridicule, and insult," . . . that is "sufficiently severe or pervasive to alter the conditions"' of . . . the victim's educational environment." *Hayut v. State Univ. of New York*, 352 F.3d 733, 744 (2d Cir. 2003) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Plaintiffs must plead the existence of circumstances that are both subjectively and objectively hostile. *See, e.g.*, *Rapuano v. Trustees of Dartmouth Coll.*, 334 F.R.D. 637, 650 (D.N.H. 2020) ("[W]hether a hostile education environment existed—calls for both objective and subjective proof. A plaintiff must demonstrate that the harassment was so severe and pervasive that a reasonable person would find the environment hostile or abusive." (internal citation omitted)).

At this stage, we find the allegation that the Policy and curriculum has created, and will create, a "racially hostile educational environment" amounts to a legal conclusion, not a statement of fact. The only facts Plaintiffs pleaded to this end are limited to the content of the curriculum—that it teaches the existence of racial and religious distinctions—and that the exposure to the Policy and curriculum makes, and will make, students feel "uncomfortable," "confused and upset." We need not outline the full contours of what a claim based on a racially

---

[16] These claims are typically advanced and analyzed under Title VI of the Civil Rights Act.

- 26 -

hostile educational environment must consist of to conclude that Plaintiffs have not stated a claim for any past violation of equal protection rights under this theory and that they lack standing to seek declaratory relief to prevent what they speculate could hypothetically occur. Plaintiffs ultimately fall short of alleging that any students have been treated differently under the Policy, curriculum, or teacher training materials. At this point, then, Plaintiffs have not presented "specific adverse claims, based upon present rather than future or speculative facts." *Daniels v. Mobley*, 285 Va. 402, 408 (2013) (quoting *City of Fairfax v. Shanklin*, 205 Va. 227, 229 (1964)). Accordingly, they have not presented a justiciable controversy.

Thus, despite general assertions of "governmental discrimination," Plaintiffs have pleaded only that ACPS taught that different racial and religious groups have different experiences, not that ACPS has treated anyone differently based on their race or religion. They have therefore failed to state a cognizable claim for relief. In addition, the allegations that Plaintiffs will be treated differently in the future under the Policy and curriculum are so speculative that they lack standing to seek declaratory relief at this time.

2. Plaintiffs failed to plead that the Policy, Regulations, or any curricula compelled Students to speak or prohibited Students from expressing certain viewpoints.

Plaintiffs allege that ACPS violated, and will continue to violate, their rights to be free from compelled speech and to freely express their views without penalty under the Virginia Constitution, Article I, § 12. That provision provides that "the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects." Our Supreme Court recently affirmed that Virginia has "the last word on the meaning of the Constitution of Virginia" and that prior decisions that have interpreted the "protection given to free speech by the Constitution of Virginia as being 'coextensive with the free speech provisions of the federal First Amendment'" were merely "acknowledge[ments] that the then-

- 27 -

existing interpretation of the First Amendment by the United States Supreme Court matches our own understanding" of the Virginia speech provision. *Vlaming*, ___ Va. at ___ (quoting *Elliott v. Commonwealth*, 267 Va. 464, 473-74 (2004)). The Court explained that a future case "might find the Virginia constitutional right of free speech is stronger than the prevailing interpretation of the First Amendment by the United States Supreme Court." *Id.* at ___. As Plaintiffs here have not advanced any argument for a broader interpretation than the "baseline protection of free expression" set by the Federal Constitution, we too refuse to "speculate on such hypotheticals" in resolving this case. *Id.* at ___.

The First Amendment restricts the government from banning speech based on the viewpoint of the speaker and from compelling anyone to speak. It is well-settled that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). While regulations that discriminate against speech based on the content of that speech "are presumptively invalid," *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992), educators still retain "comprehensive authority . . . consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools," *Tinker*, 393 U.S. at 506. Thus, while courts usually "apply the most exacting scrutiny," to review regulations of speech, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994), areas "traditionally subject to government regulation" typically receive a lower level of review, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562-63 (1980).

Student speech that "substantially interfere[s] with the work of the school or impinge[s] upon the rights of other students to be secure and to be let alone" may be regulated by schools. *Tinker*, 393 U.S. at 509. This principle was reaffirmed and extended in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1985). There, a school disciplined a student for a student

government nominating speech filled with sexual metaphor, which the school viewed as lewd. The Court upheld the school's authority to do so because of "society's . . . interest in teaching students the boundaries of socially appropriate behavior." *Id.* at 681. The First Amendment does not prevent schools from encouraging the "fundamental values of 'habits and manners of civility,'" *id.*, by "insisting that certain modes of expression are inappropriate and subject to sanctions." *id.* at 683. And "[t]he determination of what manner of speech . . . is inappropriate properly rests with the school board." *Id.*

    a.   Plaintiffs have not identified a regulation that compels speech.

A "compelled speech" claim "challenges an attempt by the government to 'compel an individual to create speech [he] does not believe' and to "'utter what is not in [his] mind' about a question of political and religious significance.'" *Vlaming*, ___ Va. at ___ (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 578-79, 596 (2023)). Plaintiffs allege that ACPS, through the Policy and curriculum, "ha[s] compelled and seek[s] to compel Plaintiffs, subject to the pains of discipline and lower academic ratings, to affirm and communicate messages that conflict with their deeply held belief." Plaintiffs' description of the speech as "compelled," however, is a legal conclusion, and we do not "accept the veracity of conclusions of law camouflaged as factual allegations or inferences." *Patterson v. City of Danville*, 301 Va. 181, 197 (2022) (quoting *Doe ex rel. Doe v. Baker*, 299 Va. 628, 641 (2021)).

Turning to the factual allegations, Plaintiffs do not allege that the Policy or Regulations themselves directly address speech in any way. And the text of those documents, attached to the Complaint, confirm that there are no references to student speech—either to any speech that is compelled, or any speech that is prohibited. Instead, the Complaint alleges more generally that under the Pilot Program and the Broader Anti-Racist Curriculum to come, the "failure to embrace 'anti-racist' beliefs and take actions consistent with those beliefs constitutes racism."

Thus, Plaintiffs deduce that the under the Policy's implementation, students are compelled to speak consistently with the general tenets of anti-racist theory. For example, Plaintiffs point to a "Review" slide from the Pilot Program Slides that posited:

> Many people say that [it] is not enough to simply be NOT racist. We must be anti-racist. What do you think is the difference? Why do you think we MUST be anti-racist, instead of simply NOT racist?

Plaintiffs also pleaded that other Pilot Program Slides stated that students should "declare and affirm how they will look, think, sound, and act 'more anti-racist.'" If the Policy or curriculum mandated that each student stand up and recite how they will look, think, and sound anti-racist, we agree that such a command might be a regulation of speech, but the actual text of the corresponding slides, reveals only thought-exercises that a classroom might engage in, without directing anyone to speak or participate.[17]

By pleading no more than legal conclusions based on these example Pilot Program Slides, Plaintiffs have identified no regulation of speech. That Defendants encouraged students to be "anti-racist," and to think about what it would mean to be "anti-racist" does not call for students to make any kind of statement. By contrast, the Supreme Court of the United States invalidated as compelled speech a West Virginia Board of Education resolution that required every student to make a "'stiff-arm' salute," mandating "the saluter to keep the right hand raised with palm turned up while the following is repeated: 'I pledge allegiance to the Flag of the United States of America and to the Republic for which it stands; one Nation, indivisible, with liberty and justice for all.'" *W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943). In

---

[17] The full text of the slide, attached to the Complaint, states that "anti-racism is an ACTION" and then posed as a question with a thought bubble prompt: "In Room 36B, we will change how we . . . look by . . . think by . . . sound by . . . act by . . . ." Another slide prompted students to consider drafting a classroom "Mission Statement" template and suggested phrases such as: "We will look more anti-racist by . . . . We will think more anti-racist by . . . . We will sound more anti-racist by . . . . We will act more anti-racist by . . . ."

explaining why the resolution violated the First Amendment, the Court distinguished "a compulsion of students to declare a belief," from instruction that would "merely" make students "acquainted with the flag salute so that they may be informed as to what it is or even what it means." *Id.*

Our Supreme Court's recent decision in *Vlaming* also highlights the shortcomings of the compelled speech claim here. The complaint there pleaded that "the School Board fired Vlaming not because of what he said but because of what he refused to say." *Vlaming*, ___ Va. at ___. The teacher used a student's "preferred name but avoided the use of any third-person pronouns when referring to [the student]." *Id.* at ___. The "School Board terminated Vlaming's employment, the complaint allege[d], because he refused to use the government-mandated pronouns *in addition to* [the student's] preferred name." *Id.* at___. Plaintiffs have failed to similarly plead that ACPS coerced them to "'mouth support' for religious, political, or ideological views that they do not believe." *Id.* at ___ (quoting *Janus v. American Fed'n of State, Cnt., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018)).

Instead, Plaintiffs have made factual allegations that Defendants acquainted Students with the principles of anti-racism, not that Defendants compelled Students to declare any belief. In reaching this conclusion, we agree with the observations of the United States District Court from Missouri dismissing similar allegations. Vague assertions that equity and anti-racism "generally require advocacy and proactivity, are wholly distinct from [a school district] compelling [students] to express specific views that they find objectionable." *Henderson v. Sch. Dist. of Springfield R-12*, 650 F. Supp. 3d 786, 794 (W.D. Mo. 2023). A school's "[e]ncouragement to follow general principles of equity and anti-racism, absent some incentive or disincentive to actually express a specific message, altogether fails to bestow injury-in-fact required for compelled speech." *Id.*

Because Plaintiffs have not pleaded that anything in the Policy or curriculum compelled speech of any kind, Plaintiffs have failed to plead a claim for compelled speech under Virginia Constitution Article I, § 12.  And, as such, any feared regulation of speech based on the expansion of these same Pilot Program Slides into the full curriculum fails to state a justiciable controversy to enable declaratory relief.

       b.   Plaintiffs have not established a claim for viewpoint discrimination.

Plaintiffs allege not only that the curriculum compelled them to speak in a manner consistent with the theory of anti-racism, but that the curriculum affirmatively regulates student speech, penalizing speech inconsistent with the Policy while allowing speech that adheres to the Policy.  Here, Plaintiffs pleaded that "Defendants have demanded, through their Policy and as part of their 'anti-racist curriculum,' that students affirm and communicate messages consistent with Defendants' radical, racially discriminatory ideology."  Plaintiffs contend that this amounts to "unconstitutional viewpoint discrimination," because teachers have "labeled dissent and expressing viewpoints (such as colorblindness) at odds with their radical, racially discriminatory ideology as 'racism.'"  Summed up, Plaintiffs allege that the Policy and curriculum categorically restrict and penalize speech that disagrees with anti-racism messaging, while allowing students who agree with the messaging to speak freely.

"Viewpoint discrimination" is an "egregious form of content discrimination." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).  "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Id.*  Viewpoint-based regulations restrict speech based on the "specific positions taken on the matter."  *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dept. of Motor Vehicles*, 288 F.3d 610, 624 n.11 (4th Cir. 2002) (quoting *Giebel v. Sylvester*, 244 F.3d 1182, 1188 n.10 (9th Cir.

- 32 -

2011)). Discrimination by viewpoint "occurs when speech is restricted because of the speaker's viewpoint on the topic—i.e., but for the perspective of the speaker, the speech would normally be permissible." *Hartman v. Thompson*, 931 F.3d 471, 479 (6th Cir. 2019).

To state a claim for viewpoint discrimination, Plaintiffs must allege that there has been some kind of regulation, or attempted regulation, of some types of speech, but not other types of speech. As discussed above, Plaintiffs do not point to any regulation of speech within the Policy or Regulations. Instead, Plaintiffs allege that the curriculum taught that "taking certain positions on such controversial political issues as school funding, immigration policy, and criminal justice reform" could "constitute racism and must be contested for one to be 'anti-racist.'" Likewise, Plaintiffs allege the curriculum taught that concepts such as "'colorblindness,' claiming we live in a 'post racial society,' asserting that '[i]t doesn't matter who you vote for,' . . . 'claiming reverse discrimination,'" "'denial of white privilege,' 'remaining apolitical,' [and] believing that 'we all belong to the human race,'" are all examples of "racism." Again, Plaintiffs have identified particular Pilot Program Slides that correspond with these allegations. And again, the Pilot Program Slides depict thought-exercises and teaching tools; they do not regulate speech based on the speaker's viewpoint.

The failure to plead any regulation of speech distinguishes this case from those holding that plaintiffs properly pleaded viewpoint discrimination claims. In *Menders v. Loudoun County School Board*, 65 F.4th 157 (4th Cir. 2023), for example, the Fourth Circuit concluded that plaintiffs had standing to challenge the school's implementation of an online form for the reporting of "bias incidents." *Id.* at 165-66. "That online form allow[ed] students to anonymously report incidents of perceived bias, which include[d] 'Harassment or Intimidation,' 'Racial Slur,' 'Offensive Language, Teasing or Taunting Language/Verbal Exchange,' 'Exclusion or victim of lack of inclusivity,' 'Gender Identity and Expression,' 'Ability Status,'

'Religious Practices,' and 'Sexual Orientation.'" *Id.* at 161. From the face of the form, it was clear that student "speech" was subject to reporting and investigation by the school. Thus, the Fourth Circuit found that not only did the form regulate speech by promising to investigate it, but also that plaintiffs had standing to challenge the policy as discriminating against students' viewpoints. *Id.* Likewise, in *Vlaming*, a claim for viewpoint discrimination was properly pleaded where the complaint alleged that "the School Board fired [the teacher] not only 'for not expressing the Board's views regarding gender identity' . . . but also for 'expressing his views' on why he could not comply with the compelled-speech directive." *Vlaming*, ___ Va. at ___. Here, there is no allegation that Defendants have similarly restricted student speech.

        c.   Even had Plaintiffs pleaded an attempt to regulate speech, Plaintiffs only speculate that a consequence will arise for declining to affirm Defendants' compelled message or for expressing a disfavored viewpoint.

Even if Plaintiffs sufficiently identified some regulation of speech in the Policy or curriculum, they failed to plead the existence of any non-speculative consequence for failing to speak as directed, or for expressing a viewpoint inconsistent with the curriculum. Without some consequence, speech cannot be compelled at all. *See Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000) (To compel speech, the policy "must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972))). Likewise, without a consequence for violating the regulation of speech, the regulation cannot be said to unconstitutionally discriminate against some viewpoints. What is more, "[a] discouragement that is 'minimal' and 'wholly subjective' does not . . . impermissibly deter the exercise of free speech rights." *Id.* at 1247-48 (quoting *United States v. Ramsey*, 431 U.S. 606, 623-24 (1977)).

While Plaintiffs plead that school administrators will interpret the failure to speak in an "anti-racist" way as a "racist act" subject to discipline under the Policy, such an allegation is not

- 34 -

supported by the Policy itself, which again this Court may consider as an "authentic,

unambiguous document[] that [is] properly . . . a part of the pleadings.'" *Dodge*, 276 Va. at 5.

This allegation is also speculative. The Regulations state:

> When school administrators determine a student has committed a
> racist act, those administrators will provide the student an
> opportunity to learn about the impact of their actions on others
> through such practices as restorative justice, mediation, role play or
> other explicit policies or training resources.

On "information and belief," Plaintiffs allege that the reference to "other explicit policies" refers

to the ACPS Student Conduct Policy which "establishes a sliding scale of discipline" including

"in-school suspension" and ultimately "expulsion."

First, Plaintiffs do not allege that ACPS has ever said that voicing disagreement or

refusing to affirm agreement with the curriculum would be a "racist act" under the Policy. Nor

do Plaintiffs allege that any student has been so disciplined, or threatened with discipline, for

failing to speak or for expressing a contrary viewpoint.[18] Plaintiffs ask us to find that it is

nevertheless a reasonable inference that the regulation of "racist acts" extends to speech, but

nothing within the Policy or curriculum supports this conclusion.[19]

---

[18] We note that Plaintiffs allege that one student "has experienced increased hostility from other students because of his Catholic faith" and that he was subject to harassment from classmates after the student "respectfully stated his beliefs—grounded in his Catholic faith—about identity during a classroom discussion." Plaintiffs do not allege that this discussion occurred as part of the anti-racist curriculum. Nor should a single instance of a classmate reacting to speech be confused as the Commonwealth's imposing punishment on a student for expressing his views.

[19] Our partially dissenting colleague, Judge Humphreys, correctly points out that the free speech right protects more than literal speech and extends to expressive conduct. But the Plaintiffs have not alleged that expressive conduct inconsistent with the Policy will be subject to discipline; rather, they have alleged a viewpoint discrimination claim that is contingent on regulation of literal speech. The conclusion he draws from *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 62 (1963), is also mistaken. There, the Supreme Court found that the bookseller had standing based on the factual "finding that the Commission's notices impaired sales of the listed publications," not based on speculation about possible future injury. *Id.* at 64 n.6.

- 35 -

Second, Plaintiffs speculate by pleading on "information and belief" that a "racist act" will be subject to discipline under the ACPS Student Conduct Policy, which includes penalties of suspension, expulsion, and "lower academic ratings." This is not a "factual allegation" regarding a past occurrence about which Plaintiffs lack full information,[20] but speculation about how ACPS might interpret and apply the Policy in the future (in contradiction to the text of the Policy itself).[21]

Here, we consider the Regulations themselves, which state only that school administrators should provide a student who commits a "racist act" with the "opportunity to learn about the impact of their actions on others." The Regulations enumerate "practices" a school administrator may use, including "restorative justice, mediation, role play or other explicit policies or training resources."[22] Nothing in the plain text of the Regulations suggests

---

[20] In contrast, our Supreme Court has accepted the pleading of factual allegations on "information and belief," such as that a pastor had "been involved in inappropriate behavior with women and/or young girls," specifically, for example, that he was involved in "an inappropriate relationship with a young girl when he was a pastor in Marion, Virginia, immediately prior to being hired" at a different church. *Doe by and Through Doe v. Baker*, 299 Va. 628, 636 (2021); *see also A.H. by next friends C.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 628 (2019) (accepting that the plaintiff pleaded upon "information and belief" that "the church defendants . . . 'became aware of'" a prior allegation of abuse at some point in 2006 "through 'a criminal and/or social services investigation,'" but finding the allegations failed "to assert facts sufficient to state a claim for negligent hiring").

[21] Federal courts have found that pleading upon information and belief is permissible where the requisite factual information is peculiarly within the defendant's knowledge or control. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009) (pleading on information and belief permissible "when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based"); *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015) (collecting cases).

[22] Plaintiffs have not alleged that these learning opportunities themselves are "punishment." For example, Plaintiffs have not alleged that students would be singled out and required to participate in role playing in front of the entire class. While Judge Beales tries to erect a consequence in the form of the "ARP infraction code," mentioned once in an attachment to the Complaint, Plaintiffs never mention the "ARP infraction code" in the Complaint or in any of their briefing. Thus to the extent we "ignore the existence of the ARP infraction code," we do

administrators intended to smuggle expulsion into a list of "practices" to educate a student about the effect of a racist action on others. And the "Policy Enforcement" section is silent about any disciplinary consequence of violating the Policy.

By not pleading that any Student was disciplined for violating what Plaintiffs perceive to be speech regulations within the curriculum, Plaintiffs fail to state any claim for past relief based on the right to speech in the Virginia Constitution. And by merely alleging the specter that a failure to speak consistently with the curriculum would be a "racist act" under the Regulations, Plaintiffs have not pleaded a justiciable interest to enable any court to provide declaratory relief. *See Lafferty*, 293 Va. at 361 (explaining a valid claim must be "based upon present rather than future or speculative facts"). To conclude, even if Plaintiffs pleaded that ACPS attempted to compel speech, or to impose viewpoint-based restrictions on speech, they failed to plead that Defendants threatened any punishment for any student's failure to comply.

3. Plaintiffs failed to plead a vagueness challenge under the Due Process Clause.

Plaintiffs allege that ACPS violated, and will continue to violate, their due process rights under Virginia Constitution Article I, § 1—that "no person shall be deprived of his life, liberty, or property without due process of law"—because the "Policy and standards are vague and give students insufficient notice on whether their desired words or actions will be considered to violate Defendants' Policy and regulations." Again, our Supreme Court recently explained that "the protections of Article I, [§] 11 are at least as strong as the existing understanding" of due process rights under the Federal Constitution, *Vlaming*, ___ Va. at ___, and Plaintiffs have not advanced any argument for a broader interpretation here.

---

so because Plaintiffs have not pleaded that it matters, let alone that it has injured, or will injure them.

Under Article I, § 11, "a government requirement 'is unconstitutionally vague if persons of common intelligence must necessarily guess at [the] meaning [of the language] and differ as to its application.'" *Id.* at ___ (quoting *Tanner v. City of Va. Beach*, 277 Va. 432, 439 (2009) (internal quotations omitted)). "A provision without 'ascertainable standards' fails to provide 'fair notice' to citizens as required by the Due Process Clause." *Id.* (cleaned up). These concerns are heightened in the free-speech context because "a vague statute may inhibit the exercise of constitutionally protected activities." *Tanner*, 277 Va. at 439-40. A criminal statute is unconstitutionally vague if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Tjan v. Commonwealth*, 26 Va. App. 698, 707 (2005) (quoting *Bouie v. Columbia*, 378 U.S. 347, 351 (1964)). "These principles are not limited to penal statutes," and apply to a school's rules. *Vlaming*, ___ Va. at ___.

Central to a vagueness challenge relating to the chilling of speech is the existence of an attempted regulation of speech that is vague. But again, as outlined above, Plaintiffs failed to plead that Defendants prohibited or mandated speech or action. Rather than identifying any prohibition on speech or action in the Policy or the curriculum, Plaintiffs generally point to phrases and sections of various materials allegedly shown to teachers—not Students—which they allege are vague.[23] More broadly, Plaintiffs allege that "[g]iven Defendants' radical redefinition of 'racism' under the Policy and curriculum, there is no defined limit to the words and actions for which Defendants can arbitrarily impose punishment." As for punishment,

---

[23] For example, Plaintiffs allege that a "Tools for Liberation Packet" entitled "Building a Multi-Ethnic, Inclusive & Antiracist Organization" instructed people to "denounce" the "celebration of Columbus Day" and states that "over familiarization with POC [people of color]" (alteration in original) is "passive racism." Plaintiffs plead that if Students fail to comply with these vague teachings as portrayed in a document that they were never shown, their noncompliance would constitute a "racist act" under the Policy.

Plaintiffs again allege that "racist acts" are subject to the broader Student Conduct Policy and its disciplinary provisions.

Ultimately, Plaintiffs allege a due process violation not based on the vagueness of any actual regulation or policy, but on the general worry that speech or actions may be unpopular and subject to consequence. [24] The Policy does have definitions, and on their face, they are not open-ended enough to raise constitutional concern. Furthermore, as we concluded above, even assuming Plaintiffs pleaded the existence of a vague regulation or policy, they failed to allege the existence of any punishment.

4. Plaintiffs have failed to state a claim for the violation of unenumerated parental rights within the Virginia Constitution's due process clause.

Plaintiffs allege that the Policy "interfere[s] with parents' fundamental right to direct the upbringing, education, and control of their children" as protected under Virginia Constitution, Article I § 11. This clause states that "no person shall be deprived of his life, liberty, or property without due process of law." "[T]he architecture of judicial power implicit in American federalism" ensures that Virginia has "the last word on the meaning of the Constitution of Virginia." *Vlaming*, ___ Va. at ___. As discussed above, our Supreme Court's past statements that the due process protections of the Virginia Constitution match those found in the Federal

---

[24] The future-facing facial challenge to the Policy here contrasts with *Vlaming,* where the Supreme Court concluded that a teacher pleaded an as-applied vagueness challenge to the school board's policies that he had been fired for violating. *Vlaming*, ___ Va. at ___. "Vlaming's as-applied claim" required "examin[ation of] the clarity of the School Board's policies not in the abstract, but as they appl[ied] to his specific situation—the avoidance of any third-person pronouns when referring to Doe, accompanied by the agreement to use Doe's preferred name." *Id.* at ___. As such, Vlaming successfully pleaded that the school's policies (which incorporated by reference "the Education Amendments Act of 1972" or "Title IX") were vague and did not "clearly inform[] teachers that they could be fired for not using third-person pronouns in addition to preferred names when referring to transgender students." *Id.* at ___. Neither policy "mentioned the use or nonuse of pronouns" or the "use of only government-approved pronouns for transgender students," so Vlaming successfully raised an "as-applied vagueness challenge" that was "specific to whether Vlaming had adequate information from the policies that he had to use 'government-approved pronouns for transgender students.'"

Constitution acknowledged only that—as of that point in time—our Supreme Court's own understanding of Article I, § 11 did not extend more broadly than the United States Supreme Court's interpretation of the Federal Due Process Clause. *See id.* at ___ (describing amendments to the Federal Constitution as establishing the floor for the guarantees within the Virginia Constitution). Plaintiffs here have not advanced any argument that Virginia's Constitution contains broader unenumerated parental rights than those recognized as the baseline of rights protected by the due process clause of the Federal Constitution, or that the unenumerated rights within the Virginia due process clause need to be interpreted in conjunction with any other constitutional provisions.[25] Thus, we rely on the existing interpretation of the Federal Due Process Clause without "speculat[ing] on" ways the Virginia constitution may be "stronger than the prevailing interpretation" of the Federal Due Process Clause by the United States Supreme Court. *Id.* at ___.

"[T]he interest of parents in the care, custody, and control of their children . . . —is perhaps the oldest of the fundamental liberty interests recognized" in American law. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Our Supreme Court has likewise recognized that the "relationship between a parent and child is a constitutionally protected liberty interest under the Due Process Clause of the Fourteenth Amendment," while noting that "[t]he due process

---

[25] In *Paris v. Commonwealth*, 35 Va. App. 377, 383 (2001), we recognized that while "substantive due process" rights have been understood to arise out of the due process clause of the United States Constitution, the Virginia Constitution contains not only a "due process clause" but an express recognition of, and protection for, unenumerated rights in Article I, § I, which states:

> That all men are by nature equally free and independent and have
> certain inherent rights, of which, when they enter into a state of
> society, they cannot, by any compact, deprive or divest their
> posterity; namely, the enjoyment of life and liberty, with the means
> of acquiring and possessing property, and pursuing and obtaining
> happiness and safety.

guarantees of Article I, [§ 11] are virtually identical to those of the United States Constitution." *L.F. v. Breit*, 285 Va. 163, 182, 182 n.7 (2013).

Along with the parental rights to care for and to generally exercise control over their children, the Supreme Court has recognized that parents have a right "to control the education of their own," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), and "to direct the upbringing and education of children under their control," *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925) (striking down state law requiring all children to attend public instead of private school); *see also Washington v. Glucksberg*, 521 U.S. 702, 719 (1997) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right . . . to direct the education and upbringing of one's children.").

We have explained that the "principal cases addressing" the rights of parents either "predate the adoption of the modern tiered system of constitutional application" or "later addressed this right but did so in tandem with religious concerns." *Hawkins v. Grese*, 68 Va. App. 462, 471 (2018). "As such, the United States Supreme Court has not stated clearly what level of scrutiny applies in addressing parental rights." *Id.* Relying on these cases, Plaintiffs argue not only for the existence of the parental right to control the curriculum provided in a public school, but assert that it is a fundamental right such that a reviewing court must apply strict scrutiny to any governmental action impinging on it.

The bundle of parental rights is made up of separate sticks, and here we are concerned only with the scope of the right to control and direct the education of children.[26] This particular

---

[26] Twenty-five years ago, and without the benefit of intervening caselaw interpreting the unenumerated rights of parents, this Court stated that "the parents' right to autonomy *in child rearing* is a fundamental right protected by the Fourteenth Amendment of the United States Constitution and that state interference with that right must be justified by a compelling state interest." *Williams v. Williams*, 24 Va. App. 778, 780 (1997), *modified and aff'd on appeal*, 256

right is neither unqualified nor absolute. The Supreme Court has noted that there is "no support [for] the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society." *Runyon v. McCrary*, 427 U.S. 160, 177 (1976). Whether or not the right is described as "fundamental," the federal appeals courts have generally applied rational basis review to matters of education.[27] And we know of no court that has held that parents have a fundamental right to direct their children's education under all circumstances.

That said, even assuming without deciding that strict scrutiny applies to evaluate any regulation impacting a parent's right to direct the education of their children, we find that the right Parents assert is broader than the constitutional right contained within the due process clause. As every court to consider the issue has held, the right to direct the education of children does not extend to allowing parents to handpick the curriculum within a public school system. Allegations that the Policy and curriculum "indoctrinat[e] their children against [their] wishes" fail to state a claim that Plaintiffs' constitutional right to direct the education of their children has been violated.

Plaintiffs have a due process right to send Students to private schools, whether religious or secular. *See Pierce*, 268 U.S. at 510. But Plaintiffs have "no [due process] right to exempt their children from certain reading programs that parents [find] objectionable, or from a school's

Va. 19 (1998). This conclusion is cabined by the context of "child rearing." The challenged statute required parents to allow non-parents (grandparents) to have visitation with children. The case did not discuss parental rights with respect to the education of their children.

[27] *See, e.g.*, *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 457 (2d Cir. 1996); *Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174 (4th Cir. 1996); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 291 (5th Cir. 2001); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 396 (6th Cir. 2005); *Griffin High Sch. v. Illinois High Sch. Ass'n*, 822 F.3d 671, 672-73 (7th Cir. 1987); *Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187, 1188 (9th Cir. 2006) (per curiam).

community-service requirement, or from an assembly program that include[s] sexually explicit topics." *Swanson By & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998) (citing *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 457 (2d Cir.), *cert. denied*, 519 U.S. 813 (1996); *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 683 (7th Cir. 1994); *Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058, 1067 (6th Cir. 1987), *cert. denied*, 484 U.S. 1066 (1988)). Likewise, they do not have a due process right to veto aspects of curriculum that challenge or conflict with their ideology or worldview.

When considering the scope of the parental due process right to control the education of their children, reviewing courts have noted the Supreme Court's later narrowing of the right as originally set out in *Meyer* and *Pierce*. In one such case, the Court described the rights established in both cases as protecting "the subject matter . . . taught at . . . private school" and the right to send children to private school. *Runyon*, 427 U.S. at 177. In another, the Court found that *Pierce* "affirmed the right of private schools to exist and operate" and "said nothing of any supposed right of parochial schools" to state funding. *Norwood v. Harrison*, 413 U.S. 455, 462 (1973). As a result, the federal appeals courts have consistently affirmed the limited nature of parental due process rights as to the education of their children.[28]

---

[28] "*Meyer*, *Pierce*, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught." *Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003) (holding that a parent did not have a right to exempt his child from health classes at school based on his moral and religious objections to their content and declining to employ strict scrutiny in coming to that conclusion). "[T]he mere fact that a child is exposed on occasion in public school to a concept offensive to a parent's religious belief does not inhibit the parent from instructing the child differently." *Parker v. Hurley*, 514 F.3d 87, 105 (1st Cir. 2008). This is because "[a] parent whose child is exposed to sensitive topics or information [at school] remains free to discuss these matters and to place them in the family's moral or religious context, or to supplement the information with more appropriate materials." *Id.*; *see also Blau*, 401 F.3d at 395 ("While parents may have a fundamental right to decide whether to send their child to a public school, they do not have a fundamental right generally to direct how a public school teaches their child."); *Swanson*, 135 F.3d at 694 ("[P]arents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject.") (holding that

The caselaw is uniform in concluding that parents do not have a due process right to control the curriculum provided in a public school. [29] Where plaintiffs assert the existence of a constitutional right that is broader in scope than what the Constitution actually protects, they have failed to state a claim for relief. *AGCS Marine Ins.*, 293 Va. at 483-84 (concluding a complaint failed to state a claim after "examin[ing] carefully the specific allegations of the claim" and concluding the right asserted was broader than the Constitution provided). We conclude, therefore, that Plaintiffs failed to state a claim for relief here.

CONCLUSION

Plaintiffs' allegations express "general disagreements with the [Policy]," which "they insist, is part of a concerted effort to indoctrinate [ACPS] children with a certain viewpoint." *Menders*, 65 F.4th at 164. "But whether that is or is not a legitimate concern, it is a concern about policy. And concerns about policy should be made to policymakers, not judges." *Id.* We affirm the circuit court's dismissal of Plaintiffs' claims.

*Affirmed.*

---

parents did not have the ability to send child to school for only certain classes and homeschool for others); *Immediato*, 73 F.3d at 457 (holding that parents could not exempt child from mandatory community service program at his school based on their moral values).

[29] We note that the General Assembly has provided potential statutory recourse for parents to challenge curriculum decisions in a public school through Code § 22.1-87. *See Lafferty*, 293 Va. at 168.

Humphreys, J., concurring in part, and dissenting in part.

I join with both of my colleagues in concluding that the provisions of the Virginia Constitution upon which the Plaintiffs relied in their complaint are self-executing and that the Albemarle School Board is not immune from suit for injunctive relief based upon alleged violations of those constitutional provisions.

With one exception, I also agree with Judge Lorish's analysis and conclusion that the Plaintiffs failed to state a cause of action for the Students' alleged constitutional and statutory injuries. However, I depart from Judge Lorish's analysis as it relates to the circuit court's dismissal of the Plaintiffs' second cause of action because, in my view, the Plaintiffs adequately pled that the Anti-Racism Policy ("ARP") unconstitutionally restricts the Students' free speech rights. Accordingly, I would hold that the Plaintiffs' pleadings were sufficient to survive ACPS' demurrer and plea-in-bar as it relates to the Plaintiffs' viewpoint discrimination claim and reverse the circuit court and remand for further proceedings on that point only.

Standing to Assert a Viewpoint Discrimination Claim

Plaintiffs' second cause of action pleads that ACPS threatens the Students with punishment if they express views that are contrary to ACPS' view on race. Plaintiffs allege that the ARP impermissibly discriminates against the Students based on the content and opinion expressed in their speech. As it relates to standing, the Plaintiffs have alleged that even though no student has yet been punished for speaking in contradiction with the ARP, that the ARP impermissibly "chills" their expression.

As our Supreme Court held in *Lafferty v. School Board of Fairfax County*, 293 Va. 354, 361 (2017), in order to have standing to institute a declaratory judgment proceeding, Plaintiffs must have a "'justiciable interest' in the subject matter of the proceeding . . . the plaintiff[s] must demonstrate an actual controversy between the plaintiff[s] and the defendant." *Id.* at 360

- 45 -

(quoting *W.S. Carnes v. Bd. of Supervisors*, 252 Va. 377, 383 (1996)). A justiciable controversy is one "where specific adverse claims, based upon present rather than future or speculative facts, are ripe for judicial adjustment." *Charlottesville Area Fitness Club Operators Ass'n v. Albemarle Cnty. Bd. of Supervisors*, 285 Va. 87, 98 (2013).

In order to assert a "specific adverse claim," the complaint must "seek a declaration of a specifically identified or actionable right belonging to" the Plaintiffs. *Lafferty*, 293 Va. at 362. As both Judge Lorish and Judge Beales have pointed out, Article 1, Section 12 of the Virginia Constitution is self-executing and provides for a private cause of action to redress alleged violations of that constitutional provision. The Plaintiffs in this case have asserted a specific adverse claim that seeks a declaration of the Students' free speech rights protected by the Virginia Constitution.[30]

### The Pleadings Sufficiently Assert a Chilled Speech Claim

The Plaintiffs in this case have also sufficiently alleged an "injury in fact" based on present facts. *Id.* at 361. The Virginia Constitution enshrines the citizens' right to free speech. Va. Const. art. 1, § 12.[31] Plainly, this right imposes restrictions on the government's ability to flatly prohibit speech. But "speech need not be banned outright to trigger [constitutional] protections. Individuals suffer a concrete injury even when the state has simply 'chilled' the right to engage in free speech and expression." *Speech First, Inc. v. Sands*, 69 F.4th 184, 192 (4th Cir. 2023). In this "chilled" speech context, the United States Supreme Court has explained

---

[30] As Judge Lorish points out, Code § 20-88.45 permits representative standing for parents to maintain proceedings on behalf of their minor children.

[31] As Judge Beales points out, infra, our Supreme Court has not yet fully delineated the extent to which Article 1, Section 2 of the Virginia Constitution is coterminous with the First Amendment to the United States Constitution. Nonetheless, our Supreme Court has held that Virginia's free speech protections are generally "coextensive" with the federal rights. *Elliott v. Commonwealth*, 267 Va. 464, 473-74 (2004).

that "[a]llegations of subjective 'chill' are not an adequate substitute for a claim of . . . a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). Instead, Plaintiffs who base their standing to sue on a "chilled" speech theory must allege facts that demonstrate that their "self-censorship is objectively reasonable." *Speech First, Inc.*, 69 F.4th at 192. Although not binding on us, the Fourth Circuit has persuasively held that this standard requires an allegation that the challenged government action is "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

To support their chilled speech argument, Plaintiffs point to the ARP which states that "[w]hen school administrators determine a student has committed a racist act, the student will be provided the opportunity to learn about the impact of their actions on others through such practices as restorative justice, mediation, role play, or *other explicit policies* or training resources." (Emphasis added.) Plaintiffs' complaint states that "the regulations' reference to 'other explicit policies' refers to [the School Board's] Student Conduct Policy." Plaintiffs allege that the Student Conduct Policy provides for a range of disciplinary measures for infractions ranging from "mediation" to expulsion. Later in their complaint, Plaintiffs claim that the Students "wish to voice their disagreement, but they are fearful that doing so will subject them to punishment."

In light of Virginia's exceptionally lenient pleading standard, I would hold that the Plaintiffs have alleged sufficient facts to show that, if proven, a person of ordinary firmness would be deterred from exercising their free speech rights to speak a contrary point of view. Unlike the federal courts, Virginia courts must consider *all* facts pled as true, not only those facts that are "plausible." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Where no evidence is taken in support of a defendant's plea in bar, "the trial court, and the appellate court

upon review, consider solely the pleadings in resolving the issue presented. In doing so, the facts stated in the plaintiff's complaint are true." *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019) (quoting *Lostrangio v. Laingford*, 261 Va. 495, 497 (2001)). Additionally, we must credit all reasonable inferences flowing from the facts alleged in the complaint. *See Vlaming v. West Point Sch. Bd.*, ___ Va. ___ (Dec. 14, 2023). Here, the Plaintiffs have alleged that, based upon existing school board policies, the Students would be subject to discipline up to and including expulsion from school if they express themselves in a way that a school administrator deems a "racist act."[32] It is reasonable to conclude that, if such is the case, a person of ordinary firmness would not speak out under such threats. As such, I would hold that the circuit court erred in dismissing the Plaintiffs' second cause of action for lack of standing.

For similar reasons, I would not apply the "right-result-different-reason doctrine" to hold that the Plaintiffs failed to state a claim upon which relief could be granted for a violation of the Students' free speech rights. "The government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Viewpoint discrimination is a form of content discrimination, and in order to state a claim of viewpoint discrimination, the Plaintiffs must have alleged that the school board has regulated expressive conduct because of disagreement with the message it conveys.

---

[32] Judge Lorish points out that the Plaintiffs have not alleged that ACPS has expressly stated that voicing disagreement with ACPS' views would qualify as a racist act under the ARP, nor has ACPS actually disciplined any ACPS student for expressing dissent. Though such allegations would certainly strengthen Plaintiffs' chilled speech argument, plaintiffs who allege that their speech has been chilled need not allege that the government has *expressly* threatened them with consequences for expressing a certain viewpoint. *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 62 (1963) (finding bookseller had standing to sue for a violation of its First Amendment rights when a state commission sent letters thanking the bookseller in advance for its "cooperation" in limiting the spread of books that were "objectionable for sale," and "reminding" the bookseller of the commission's duty to "recommend" charges to the attorney general, despite the fact that the commission had no formal enforcement authority). In this case the Students have asserted facts which implicitly suggest that a student could be disciplined for expressing a contrary viewpoint.

*See id.* at 829 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).[33]

Judge Lorish concludes that the Plaintiffs have not alleged that ACPS regulated student speech. I disagree. The ARP prohibits "racist acts," and the Plaintiffs have alleged that a student who commits a racist act is subject to discipline. As noted above, we are to credit the Plaintiffs' complaint with all reasonable inferences that flow from the facts alleged in the complaint. Though not specifically stated, it is reasonable to infer that the regulation of "racist acts" extends to speech.[34] What's more, the free speech right covers more than literal speech and extends to all manner of expressive conduct, not simply mere words. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397 (1989) (affirming the reversal of a conviction for flag burning on First Amendment grounds). The United States Supreme Court has "long held, for example, that nonverbal expressive activity *can* be banned because of the action it entails, but not because of the ideas it expresses." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992).[35]

In that vein, if "racist acts" covers expressive conduct, then the ARP is plainly a content-based restriction. The only way to tell whether expressive conduct is "racist" or not is to look to

---

[33] Our Supreme Court recently reaffirmed the validity of viewpoint discrimination claims under the Virginia Constitution in *Vlaming*, ___ Va. at ___ n.37.

[34] I agree with Judge Lorish, however, that it is unreasonable to infer that the ARP's prohibition on racist acts *compels* the students to speak in any matter. It is not reasonable to infer that the phrase "racist act" covers the *failure* to speak in a particular manner.

[35] Judge Lorish contends that the Plaintiffs have not alleged that they intend to voice their disagreement by way of expressive conduct, but only through literal speech. It would be rather absurd to require free speech plaintiffs to plead every single way that they intend to express their disagreement with government speech in order to survive a demurrer. In my view, it is enough that plaintiffs have stated that they wish to express disagreement and the ARP, as Plaintiffs have alleged, is reasonably likely to subject them to discipline for such expression.

the idea expressed by the conduct. As alleged by the Plaintiffs, the ARP not only regulates speech based on its content, i.e., asserting a racial message, but also that the ACPS has specifically threatened potential sanctions for expressing contrary viewpoints on race.

This is especially true when the ARP is considered in light of the Plaintiffs' allegations of what ACPS has defined as racism. For example, Plaintiffs alleged that in the context of its pilot program and policy definitions, ACPS has labeled the endorsement of "colorblindness," "'claiming reverse discrimination' . . . 'denying white privilege' and saying 'we all belong to the human race'" as racist views subject to discipline if expressed. Plaintiffs have also alleged that ACPS considers "support for immigration control, local school funding, and English language initiatives as racism." Although these examples come from the now-expired pilot program, they are nonetheless relevant to the Plaintiffs' viewpoint discrimination claim as they provide context for their claim seeking a declaratory judgment that the School Board would consider the expression of such views a "racist act" subject to discipline.

I note that even if ACPS defined racism more narrowly, i.e., prejudice based on race, the ARP would still amount to a viewpoint-based regulation. ACPS' goal of eliminating racism is commendable, but the Constitution protects an individual's right to express views in opposition to that idea. As our Supreme Court recently confirmed, the government may not "penalize or discriminate against individuals or groups because they hold . . . views abhorrent to the authorities." *Vlaming*, ___ Va. at ___ (quoting *Sherbert v. Verner*, 374 U.S. 398, 402 (1963)). "Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar grounds is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)).

Even accepting that the ARP regulates speech, Judge Lorish nevertheless would hold that the Plaintiffs failed to allege that the ARP provides an enforcement mechanism sufficient to deter the exercise of the Students' free speech rights. Again, I respectfully disagree. As noted above, the Plaintiffs have alleged that the ARP permits ACPS to discipline a student for committing a racist act. Although the ARP itself does not explicitly provide for disciplinary proceedings against a student for their expression, Plaintiffs have expressly alleged that the ARP's reference to "other explicit policies" is a reference to the Student Conduct Policy. This is a factual allegation that, under the Commonwealth's precedents regarding pleadings, we are *required* to accept as true, not, as Judge Lorish suggests, an inference that we must only accept if we think it reasonable.

My view that Plaintiffs have pled the bare minimum necessary to allege a legally cognizable injury should in no way be viewed as an assessment of the strength of the Plaintiffs' case on the merits of their viewpoint discrimination claim. Plaintiffs very well may ultimately fail to prove the facts alleged in their complaint necessary to support their claim of viewpoint discrimination at trial. Nonetheless, at this preliminary stage, I conclude that the Plaintiffs have sufficiently alleged that ACPS has violated the Students' free speech rights by engaging in unconstitutional viewpoint discrimination.[36] Accordingly, I would only reverse the circuit court's dismissal of the Plaintiffs' second cause of action and remand for further proceedings.

---

[36] Because the circuit court did not reach Plaintiffs' motion for a preliminary injunction, I would simply remand this issue to the circuit court for consideration of that issue.

Beales, J., dissenting in part, and concurring in the judgment in part.

The circuit court dismissed this case with prejudice without even having a hearing where testimony could be taken or evidence admitted.  As soon as counsel for the Plaintiff Parents and Students had finished his argument to the circuit court at the brief hearing held on the Albemarle Public Schools' plea in bar and demurrer, the circuit court instructed counsel for the School Board to draft an order granting the plea in bar and dismissing the Plaintiff Parents' and Students' case with prejudice.

In such a hearing on deciding a plea in bar,[37] clear commands from the Supreme Court of Virginia dictate that the circuit court must accept the plaintiffs' factual allegations in the pleadings (and attachments to them) as true.  The same is basically true for deciding a demurrer, where the allegations in the complaint (and attachments to it) must be accepted as true.  Likewise, on appeal, the Supreme Court has been clear that appellate courts must review the circuit court's rulings by considering the pleadings (and attachments to them) filed in the circuit court and by accepting the plaintiffs' factual allegations in those pleadings as true.  Here, the Plaintiff Parents and Students have sought a declaratory judgment and injunctive relief (among other things) by alleging claims of discrimination based on religious beliefs, claims of racial discrimination, and claims of compelled speech that, if true, would violate the Constitution of Virginia.  Because, at this stage of the litigation, we must accept Plaintiffs' factual claims as true, the issue before this Court is merely whether the Plaintiff Parents and Students have *alleged* constitutional violations that have caused or potentially will cause them harm.  Clearly, they have.  And I note later in this dissent some of the examples that the Parents have asserted that violate their children's rights under the Virginia Constitution by treating them differently based

---

[37] Five of the six counts in Plaintiffs' complaint were dismissed on the granting of the plea in bar.  One count was dismissed on sustaining the demurrer.

on their race or their religious beliefs or by, as Plaintiffs allege, "compel[ling] Plaintiffs, subject to the pains of discipline and lower academic ratings, to affirm and communicate messages that conflict with their deeply held beliefs." In short, the Plaintiff Parents and Students deserve at least an *ore tenus* hearing on the merits of their claims. Yet the circuit court denied even having such a full hearing on the merits before dismissing the Parents' and Students' case with prejudice (and without leave to amend their pleadings). Because doing so was error and because the majority opinion affirms these significant errors by upholding the judgment of the circuit court, I must dissent.[38]

## I. THE BACKGROUND FOR THIS LAWSUIT

On December 22, 2021, a number of parents, including Carlos and Tatiana Ibanez, Matthew and Marie Mierzejewski, Kemal and Margaret Gokturk, Erin and Trent Taliaferro, and Melissa Riley (collectively "Parents") – each also representing their minor children, V.I., R.I., P.M., T.G., N.G., D.T., H.T., and L.R. (collectively "Students") – filed a Complaint (along with numerous attachments to the Complaint) against the Albemarle County School Board, Albemarle Schools Superintendent Matthew S. Haas, and Assistant Superintendent Bernard Hairston (collectively "Albemarle Public Schools" or "Albemarle Schools"). The minor children were all students who were enrolled in the Albemarle County Public Schools. In the Complaint, the Plaintiff Parents and Students allege a number of violations of their rights, including that the Albemarle Public Schools have engaged in unconstitutional discrimination based on students' race and students' religious beliefs – and have compelled student speech. The Complaint and the Parents' other pleadings allege that this discrimination that has occurred since the Spring of 2021 semester is pursuant to the Albemarle Public Schools' "Anti-Racism Policy" (hereinafter the

---

[38] I concur in the judgment of the majority only with respect to the second count in the Plaintiffs' Complaint, which contends that the Albemarle Public Schools System has taken unconstitutional action with students regarding viewpoint discrimination.

"ARP").  Furthermore, the Plaintiff Parents allege that, despite its name, the ARP "fosters racial division, racial stereotyping, and racial hostility."

The School Board first adopted the ARP Policy in 2019 and has since been implementing it throughout the Albemarle Public Schools.  The ARP outlined how Albemarle Public Schools would utilize a new curriculum, newly revised instructional materials, and staff training to accomplish its instructional goals with students.  The ARP also called for a way for students and staff to anonymously report "racism and other forms of discrimination," and stated that an annual evaluation report would be drafted to review the implementation of the ARP and its "anti-racist curriculum" (hereinafter the "ARC").

The Plaintiff Parents allege in their Complaint that teachers and staff underwent mandatory orientation and training to implement the goals of the ARP.  The orientation session included a video of Assistant Superintendent Bernard Hairston discussing the principles of the ARP.  The Complaint provides a link to this video, in which Hairston emphasizes to staff, "You are either a racist or an anti-racist."  The Albemarle Schools further conducted a monthly training with teachers and other staff that involved studying and learning the tenets of the ARP.

According to the Complaint, Albemarle Public Schools also began implementing its new ARC curriculum, and started with a pilot program in classes at Henley Middle School in the Spring semester of 2021.  In developing its curriculum, the Albemarle Public Schools relied on several books, including *This Book is Anti-Racist*, by Tiffany Jewell, and *Letting Go of Literary Whiteness: Antiracist Literature Instruction for White Students*, by Carlin Borsheim-Black and Sophia Sarigianides.  The pilot program, specifically the eighth grade curriculum, taught students, "The dominant culture is… … in the U.S.: people who are white, middle class, Christian, and cisgender."  (ellipses included in original).  The ARC curriculum then defined the other culture as "Subordinate Culture: Black, brown, indigenous people of color of the global

majority, queer, transgendered, non-binary folx, cisgender women, youth, Muslim, Jewish, Buddhist, atheist, non-Christian folx, neurodiverse, folx with disabilities, folx living in poverty."

The eighth grade curriculum also instructed students, "The [ARP] Policy is nothing without action. Now, we know there is a policy and we understand what it means! It is time to act." The curriculum told students, "In the absence of making anti-racist choices, we (un)consciously uphold aspects of white supremacy, white-dominant culture, and unequal institutions and society."

In the Complaint and its attachments, the Plaintiff Parents claim that the Albemarle Public Schools are using the ARP and ARC curriculum to violate the Students' and Parents' rights under the Constitution of Virginia. [39] Specifically, the Complaint alleges (1) violations of their right to freedom from government "discriminating on the basis of race and creating or permitting a racially hostile educational environment" (including stated plans to segregate classes during some of the ARC instruction); (2) violations of their right to freedom from governmental discrimination based on their religious convictions (including telling Christian students that their "dominant" "Christian culture" is something they must "fight against"); (3) violations of their "right to freedom of speech" (including essentially requiring agreement with the ideological tenets of the ARC curriculum under threat otherwise of an ARP disciplinary infraction or, at least, the punishment of social ostracism for being labeled a racist at their school); and also (4) violations of their due process and parental rights. (Internal quotation

---

[39] Contrary to the majority's contention, the Plaintiffs here do not rely just on federal caselaw in their allegations that their rights under the Constitution of Virginia have been violated. The Plaintiffs in this case also do not argue that their rights under Virginia's Constitution are limited to what is protected by the United States Constitution. Where appropriate, of course, the Plaintiffs cite to U.S. Supreme Court decisions – especially in instances where prior Virginia Supreme Court cases have relied on the principles in federal caselaw. Clearly, however, the Plaintiffs' general argument here is that the Virginia Constitution is broad enough to protect them from the Albemarle Public Schools' conduct that they allege to be unconstitutional under Virginia law.

marks omitted).  Parents also filed a motion for a preliminary injunction during the litigation of their suit along with an appendix of attachments to that motion.  The Albemarle Schools filed a plea in bar, a demurrer, and a motion craving oyer.  The plea in bar raised a defense of sovereign immunity and also alleged that Parents lacked standing to sue.  The demurrer contended that the Parents are not entitled to relief based on what they allege to the court.

The circuit court conducted a motions hearing on April 22, 2022.  Immediately after the Parents' argument, the circuit court directed counsel for the Albemarle Public Schools to prepare an order granting Albemarle Public Schools' plea in bar, sustaining its demurrer as to the Parents' parental rights claim, and dismissing the Plaintiffs' case with prejudice.  The circuit court then entered a written final order on June 1, 2022, that granted Albemarle Public Schools' plea in bar and sustained its demurrer as to the parental rights claim.  The circuit court held that the Parents lacked standing to bring their claims and that the Parents failed to state a cause of action "arising under Virginia law because their claims under the Constitution of Virginia are not self-executing and the statute upon which they rely does not create a private cause of action."  Plaintiff Parents now appeal to this Court.

II.  ANALYSIS

A.  Standard of Review

As the Supreme Court has stated, "The purpose of a demurrer is to determine whether a complaint states a cause of action upon which relief may be granted."  *Kaltman v. All Am. Pest Control, Inc.*, 281 Va. 483, 488-89 (2011).  In addition, as the Supreme Court has further stated, "On demurrer, a court may examine not only the substantive allegations of the pleading attacked but also any accompanying exhibit mentioned in the pleading."  *Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 166 n.2 (2022) (internal quotation omitted) (citing Rule 1:4(i) ("The mention in a pleading of an accompanying exhibit, of itself and without more, makes such

exhibit a part of the pleading.")).  Therefore, because the circuit court decided the Parents'

parental rights claim in this case on demurrer, for that one cause of action "we recite as true the

facts alleged in the motion for judgment and its exhibits, and the fair inferences therefrom."  *Fun*

*v. Virginia Mil. Inst.*, 245 Va. 249, 250 (1993).  Furthermore, "we assume without any

corroboration that factual allegations made with sufficient definiteness are presumptively true."

*Morgan v. Bd. of Supervisors of Hanover Cnty.*, ___ Va. ___, ___ (Feb. 2, 2023).

When reviewing a plea in bar, if the circuit court heard "evidence on the plea *ore tenus*, the

circuit court's factual findings are accorded the weight of a jury finding . . . [but] where no evidence

is taken in support of a plea in bar, the trial court, and the appellate court upon review, consider

solely the pleadings in resolving the issue presented."  *Massenburg v. City of Petersburg*, 298 Va.

212, 216 (2019) (internal quotation marks and citations omitted) (emphasis added); *see Lowdon v.*

*Lowdon*, 183 Va. 78, 79 (1944) (finding that "[s]ince the evidence was heard *ore tenus* and the trial

court saw and heard the witnesses, its finding has the force and effect of the verdict of a jury").  In

addition, as the Supreme Court has explained, when reviewing a plea in bar decided on the

pleadings "[t]he facts as stated in the pleadings by the plaintiff are taken as true for the purpose of

resolving the special plea."  *Gray v. Va. Sec'y of Transp.*, 276 Va. 93, 97 (2008) (internal

quotation omitted); *Safeway, Inc. v. DPI Midatlantic, Inc.*, 270 Va. 285, 286 n.1 (2005) ("The

circuit court heard no evidence in support of the employer's plea in bar.  Thus, we consider only

the pleadings in resolving the issue presented and take the facts stated in the third-party

plaintiff's pleadings as true.").  As the Supreme Court has clarified, "This approach results in

functionally de novo review of the [circuit] court's judgment" where "we, like the [circuit] court,

rely solely on the pleadings in resolving the issue before us."  *Massenburg*, 298 Va. at 216-17

(internal quotation omitted).  In addition, under the Rules of the Supreme Court of Virginia, all

motions in writing are pleadings.  Rule 3:18(a); *Algernon Blair, Inc. v. Norfolk Redevelopment &*

*Hous. Auth.*, 200 Va. 815, 818 (1959) (noting that "Appellant's written motion to reject appellee's motion for a summary judgment is a pleading" (citing Rule 3:18(a))). Indeed, the Supreme Court just recently ruled that, in a case where the circuit court "ended [the] case at its earliest stage by sustaining the School Board's demurrer and granting the School Board's plea in bar," the Supreme Court itself was required "to assume as true each of [the plaintiff's] factual allegations and any reasonable inferences from those allegations." *Vlaming v. West Point Sch. Bd.* ___ Va. ___, ___ (Dec. 14, 2023).

Here, because the circuit court did not hear evidence *ore tenus* on the plea in bar, the circuit court's decision is not accorded the weight of a jury's verdict. *See Massenburg*, 298 Va. at 216-17; *Smith v. Brown*, 291 Va. 260, 262 (2016) (finding *ore tenus* evidence to be different than a person's affidavit). In its "Brief in Support of Demurrers and Plea in Bar," the Albemarle Public Schools argued to the circuit court, "At this stage the Court accepts as true the facts stated in the plaintiff's pleadings for purposes of resolving the plea in bar." (Internal quotation omitted). During the hearing, the circuit court did not take any testimony or admit any evidence. The circuit court's final order declares that it considered the pleadings, briefs to the circuit court, and oral argument before it.

As the Supreme Court has made clear, appellate courts consider on appeal all of the pleadings when reviewing the plea in bar – including here the Complaint, the Motion for Preliminary Injunction, and their referenced, attached documents such as the declarations/affidavits of the Plaintiff Parents, and "[t]he facts as stated in the pleadings by the plaintiff[s] are taken as true." *Gray*, 276 Va. at 97; *Massenburg*, 298 Va. at 217. Furthermore, as the Supreme Court has just recently confirmed, we "draw any reasonable inferences from those facts in [the Plaintiffs'] favor." *Vlaming*, ___ Va. at ___.

B.  <u>Sovereign Immunity</u>

Plaintiff Parents argue that Article 1, § 11 and Article I, § 12 of the Constitution of Virginia (found in the Virginia Bill of Rights) prohibit government discrimination based on religion or race, prohibit the government from depriving citizens of their liberty without due process of law, and prohibit the restraint of freedom of speech.  Parents further argue that these constitutional provisions in the Virginia Bill of Rights are "self-executing" and therefore "waive[] Sovereign Immunity."

In the Bill of Rights in Article I of the Constitution of Virginia, the two constitutional provisions at issue in this appeal state in relevant part:

> That no person shall be deprived of his life, liberty, or property without due process of law; that the General Assembly shall not pass any law impairing the obligation of contracts; and that the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged, except that the mere separation of the sexes shall not be considered discrimination.

Va. Const. art. I, § 11.

> That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people peaceably to assemble, and to petition the government for the redress of grievances.

Va. Const. art. I, § 12.

At the outset, I would note that the Supreme Court just recently resolved the merits of a plaintiff's claims solely under Article I, § 12 of the Constitution of Virginia, under the due process clause of Article I, § 11 of the Constitution of Virginia, and other state law provisions. *Vlaming*, ___ Va. at ___, ___.  The Supreme Court held in that case that the plaintiff teacher had stated causes of action against the School Board based on Article I, §§ 11 and 12 of the

- 59 -

Constitution of Virginia, as well as other grounds, without discussing sovereign immunity as a bar to the suit. *Id.* at ___; *see also Loudoun County Sch. Bd. v. Cross*, No. 210584, 2021 WL 9276274, at *6 (Va. Aug. 30, 2021) (finding that "Cross relies on Art. I, § 12 of Virginia's Constitution" and affirming the circuit court's ruling that Cross was likely to succeed on his free speech claims); *Richmond Newspapers, Inc. v. Commonwealth*, 222 Va. 574, 588 (1981) ("[W]e rest our decision on Article I, Section 12."). Similarly, in *Wilkins v. West*, 264 Va. 447, 466-67 (2002), the Supreme Court resolved the merits of a discrimination claim against government defendants "solely under Article I, § 11 of the Constitution of Virginia," and the Court stated its expectation that other § 11 discrimination claims would follow. Furthermore, in cases brought under both federal law and the non-discrimination provision of Article I, § 11, the Supreme Court has resolved the discrimination claims on their merits. *See Archer v. Mayes*, 213 Va. 633, 638 (1973); *Duke v. Pulaski County*, 219 Va. 428, 433 (1978). However, because sovereign immunity was not raised in those cases, I review both § 11 and § 12 of our Bill of Rights to determine whether either or both sections are self-executing and therefore waive sovereign immunity.

In *Robb v. Shockoe Slip Foundation*, 228 Va. 678, 681 (1985), the Supreme Court of Virginia clearly stated, "[C]onstitutional provisions in bills of rights and those merely declaratory of common law are usually considered self-executing. The same is true of provisions which specifically prohibit particular conduct." The Supreme Court in *Robb* went on to state, "Provisions of a Constitution of a negative character are generally, if not universally, construed to be self-executing." *Id.* at 681-82 (quoting *Robertson v. Staunton*, 104 Va. 73, 77 (1905)).

The Supreme Court has subsequently applied the standard utilized in *Robb* to several provisions of our Bill of Rights and held that they are self-executing. In *Gray v. Virginia Secretary of Transportation*, 276 Va. 93, 103 (2008), the Supreme Court found that Article I, § 5

was self-executing because it was contained in the Bill of Rights and no additional legislation was needed to carry into effect its clear mandate that the "departments shall be separate and distinct." The Supreme Court also held that two provisions *not* found in the Bill of Rights were also self-executing. Article III, § 1 was self-executing because "it is of a negative character and specifically prohibits certain conduct," and Article IV, § 1 provided a clear rule and, for that reason, it was self-executing even though it is not "cast in a negative character." *Id*. at 105.

More recently, the Supreme Court applied the standard in *Robb* to a case against a public university, George Mason University. *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 281 Va. 127, 138 (2011). The Supreme Court in *DiGiacinto* held that Article I, § 14 is self-executing because (1) it "is within the Bill of Rights," and (2) it "is stated in the negative, prohibiting any government 'separate from, or independent of, the government of Virginia,'" so, consequently, that provision "does not require further legislation to make it operative." *Id*. at 138 (where the Supreme Court stated, "[S]overeign immunity does not preclude declaratory and injunctive relief claims based on self-executing provisions of the Constitution of Virginia."). Furthermore, the Supreme Court also treated Article I, § 13 of our Bill of Rights as self-executing and decided that claim on its merits. *Id*. at 137.

At oral argument before this Court, counsel for Albemarle Public Schools asserted in response to a question posed by the Court that the non-discrimination clause in Article I, § 11 is not self-executing and therefore would not grant students challenging even race-based segregation in public schools a remedy under the Virginia Constitution. This is a remarkably stunning claim. In a shameful part of Virginia's history, many school boards in our Commonwealth segregated students in public schools based on their race. Indeed, in *Brown v. Board of Education*, 349 U.S. 294 (1955), where the U.S. Supreme Court struck down the so-called "separate but equal" policies in public schools that deprived children of the equal

protection of the laws guaranteed by the Fourteenth Amendment, numerous federal and state court decisions were reversed – including in the U.S. District Court for the Eastern District of Virginia, which had affirmed the Prince Edward County School Board's policy of racial segregation in its public schools. *See Davis v. Cnty. Sch. Bd. of Prince Edward Cnty., Va.*, 103 F. Supp. 337, 338 (E.D. Va. 1952), *rev'd sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955). Since that time, Virginia has adopted a new constitution that became effective in 1971. That new 1971 Constitution, which is, of course, still in effect today, includes a provision explicitly banning government discrimination based on race – the non-discrimination provision found in Article I, § 11. However, following the logic put forward by counsel for Albemarle's response to this Court's question at oral argument, even though § 11 explicitly declares "that the right to be free from any governmental discrimination . . . shall not be abridged," this provision supposedly in reality would do nothing to abridge governmental discrimination at all. That is because, according to counsel for Albemarle, § 11 is not self-executing – not even when applied to racial segregation in public schools. Therefore, according to Albemarle Public Schools, a claim of sovereign immunity would require the dismissal of even a *Brown v. Board of Education*-type lawsuit against a local school board based solely on Article I, § 11 of Virginia's Constitution. I am not at all persuaded that the non-discrimination clause in the Bill of Rights of the Virginia Constitution is so toothless.

Applying the standard used by our Supreme Court in *Robb* to the case now before us, I again note the obvious fact that Article I, §§ 11 and 12 are both constitutional provisions in our Virginia Constitution's Bill of Rights. *See Robb*, 228 Va. at 681. Second, §§ 11 and 12 of Article I also set negative prohibitions. Section 11 prohibits government from discriminating upon the basis of certain characteristics such as religious conviction, race, color, sex, or national origin – and also prohibits government from depriving citizens of life, liberty, or property

without due process of law. Section 12 prohibits the restraint and abridgement of the freedom of speech and freedom of the press. *See id.* at 681-82 ("Provisions of a Constitution of a negative character are generally, if not universally, construed to be self-executing." (quoting *Robertson*, 104 Va. at 77)). Finally, Virginia has historically addressed claims against government defendants based on Article I, § 11 or Article I, § 12 on the merits. *See e.g.*, *Vlaming*, ___ Va. at ___, ___; *Wilkins*, 264 Va. at 467. For all of these reasons, and consistent with clear precedent from the Supreme Court of Virginia, the non-discrimination, due process, and free speech provisions in the Virginia Bill of Rights in Article I, § 11 and Article I, § 12 of the Virginia Constitution are self-executing – and therefore waive the government defendants' sovereign immunity for a properly pled complaint.[40]

### C.  Standing for Declaratory Judgment

"Standing to sue is part of the common understanding of what it takes to make a justiciable case." *Morgan*, ___ Va. at ___ (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)). The Supreme Court has stated, "A plaintiff has standing to bring a declaratory judgment proceeding if he has a justiciable interest in the subject matter of the litigation." *Cupp v. Bd. of Supervisors of Fairfax Cnty.*, 227 Va. 580, 590 (1984) (internal quotation omitted); *Lafferty v. Sch. Bd. of Fairfax Cnty.*, 293 Va. 354, 360 (2017). The scope of a declaratory judgment proceeding is defined by statute in the first portion of Code § 8.01-184, which provides:

---

[40] However, when dealing with a statute, the Supreme Court has clearly held that a waiver of sovereign immunity "must be explicitly and expressly stated in the statute." *Gray*, 276 Va. at 102. The General Assembly did not add any language to Code § 1-240.1 that expressly waives sovereign immunity. Therefore, the Plaintiffs cannot recover for a claim under this statute by itself because the General Assembly did not expressly waive sovereign immunity in Code § 1-240.1. However, I would not hold that parents simply do not have a private cause of action under Code § 1-240.1 – just that the General Assembly has not expressly waived sovereign immunity with this statute.

In cases of actual controversy, circuit courts within the scope of their respective jurisdictions shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed and no action or proceeding shall be open to objection on the ground that a judgment order or decree merely declaratory of right is prayed for.

In *Berry v. Board of Supervisors of Fairfax County*, ___ Va. ___ (Mar. 23, 2023), the Supreme Court stated, "The Declaratory Judgment Act, Code § 8.01-184 et seq., represents a departure from the common law requirement that a litigant suffer actual damage before filing suit." *Id.* at ___ (citing *Miller v. Highland County*, 274 Va. 355, 370 (2007)). In describing Virginia's Declaratory Judgment Act, the Supreme Court emphasized, "By its own terms, it provides 'relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade the rights asserted by the other as to entitle him to maintain an ordinary action therefor.'" *Id.* at ___ (quoting Code § 8.01-191). As the Supreme Court has stated, it "provides a speedy determination of actual controversies between citizens, and [operates] to prune, as far as is consonant with right and justice, the dead wood attached to the common law rule of injury before action[.]" *Morgan*, ___ Va. at ___ (internal quotation omitted).

Consequently, just last year the Supreme Court held that to plead a justiciable declaratory judgment claim, a plaintiff must allege present facts demonstrating "a 'substantial risk' that the harm will occur." *Id.* at ___ (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *Lafferty*, 293 Va. at 361 (finding that a plaintiff must allege an "actual *or potential* injury in fact" (emphasis added)). Indeed, if a party has already incurred actual injuries and no future harm is likely, then a declaratory judgment is not appropriate, and that party would instead pursue an action at law. *See USAA Cas. Ins. Co. v. Randolph*, 255 Va. 342, 347 (1998). Of course, "[i]n doing away with the requirement that a litigant suffer actual damage before filing suit, the [Virginia Declaratory Judgment] Act does not permit a litigant to bring an action that is

moot or in which the claims are so speculative that the action is not ripe for adjudication."

*Berry*, ___ Va. at ___ (internal citation omitted). A valid claim must generally be "based upon

present rather than future or speculative facts." *Lafferty*, 293 Va. at 361 (internal quotation

omitted); *see Morgan*, ___ Va. at ___ (explaining that failure "to offer *any* factual background

from which to infer . . . actual harm," and "generaliz[ing] . . . in the abstract" are insufficient to

show standing).

These principles were recently applied by the Supreme Court in *Morgan* where

homeowners brought a declaratory judgment action against their county Board of Supervisors for

authorizing the construction of a distribution facility in violation of Virginia law. ___ Va. at

___. Reversing the circuit court, the Supreme Court held that the homeowners' allegations of

future harm were not speculative – and that the homeowners had standing because (accepting the

plaintiffs' allegations as true), they demonstrated a likelihood of future harm. *Id*. at ___, ___.

The Court explained:

> [T]he homeowners assert harms specific to Wegmans's intended
> expansion including tractor-trailer traffic on specific feeder roads
> surrounding the [planned Wegmans's] facility, the increased level
> of noise caused by back-up alarms from these trucks (allegedly in
> violation of the local noise ordinance after a sound study by
> County staff), anticipated flooding caused by the topography of the
> project, and the night-sky light pollution from taller lighting poles
> in the parking areas.

*Id*. at ___. The Supreme Court held that these allegations in the plaintiffs' pleadings, "when

assumed to be true, satisfy this standard of likelihood of harm" – i.e., an allegation of future

injury where "there is a 'substantial risk' that the harm will occur." *Id*. at ___. Consequently,

the Supreme Court reversed and remanded the case for further proceedings because "the circuit

court erred in finding that the homeowners' pleadings did not allege a sufficient factual basis for

standing." *Id*. at ___.

Six years before *Morgan*, the Supreme Court also addressed these principles in *Lafferty*, where the plaintiffs sought to prevent the Fairfax County School Board from adding language to its general non-discrimination policy. *Lafferty*, 293 Va. at 358. The School Board in *Lafferty* had voted to add "sexual orientation" and "gender expression" to its non-discrimination policy, and voted to prohibit "gender identity" and "gender expression" discrimination. *Id.* The plaintiffs in *Lafferty* sought to stop those new School Board decisions from taking effect. *Id.*

In *Lafferty*, the Court determined that the student plaintiff, Jack Doe, did not plead sufficient facts to support his allegations of harm. *Id.* Specifically, the Court stated that Jack did not have standing because the pleadings "fail[ed] to allege actual *or potential* injury in fact based on present rather than future or speculative facts." *Id.* at 361 (internal quotation omitted) (emphasis added). The Court explained:

> Jack Doe fears that the policy might involve the use of his bathroom or locker room by a transgender student. Jack's sharing of a bathroom or locker room by a transgender student is, however, a purely speculative fact. It is not clear what, if any, bathroom policies are being implemented, or even that Jack attends school with a single transgender student.

*Id.* Similarly, the Court recognized that Jack alleged that he was "'distressed' about how his words might be misinterpreted and thinks cautiously about his speech. Yet Jack [did] not allege any present facts that would place him in violation of the policy, rendering any injury purely speculative." *Id.* Indeed, although Jack feared school discipline, the Court recognized that Jack did not connect his alleged harm to any present facts in his pleadings, stating, "We are left with Jack's bald assertion of fear of discipline *without any alleged predicate facts to form the basis for such a fear.*" *Id.* (emphasis added). In short, the student-plaintiff in *Lafferty* had only a "general distress over a general policy," because he pleaded "purely speculative fact[s]" about policies where it was "not clear what, if any, bathroom policies are being implemented," and because his "bald assertion" of harm from the new language in the non-discrimination policy was

not connected to "any alleged predicate facts." *Id.* at 361. For example, it was not yet apparent whether any transgender student would use the bathroom that Jack and other males used – or would use a separate bathroom assigned to neither males nor females.

In contrast to the lack of facts in *Lafferty*, Plaintiff Parents here allege that the challenged policy and curriculum are already being implemented. In addition, the Parents contend that their pleadings demonstrate how the policies and curriculum are beginning to particularly harm and will harm their minor children here. The Parents argue that their specific allegations of harm are enough to at least grant them standing to bring this lawsuit and afford them the chance to prove their claims in court. I review each of their arguments in turn.

1. Plaintiffs Pleaded How the ARP and its Curriculum Are Being Implemented

Parents argue on brief to this Court that they filed extensive pleadings in the circuit court along with attachments to those pleadings that included, among other documents, "the [ARP] Policy and implementing regulations, R.60-65; materials explaining the Policy to the public, R.68-126; training documents for implementing the Policy in teachers' classrooms, R.66-67, 127-46, 178-87; and materials showing presentations and classroom exercises that already had been used to implement the Policy with students, R.147-77, 188-91."

For the purpose of reviewing the circuit court's rulings on the Albemarle Public Schools' plea in bar and demurrer, where no evidence was heard *ore tenus*, on appeal this Court must take the Plaintiffs' factual allegations as true, and draw any reasonable inferences from those facts in the Plaintiffs' favor, as noted *supra*. *Vlaming*, ___ Va. at ___, ___; *see Gray*, 276 Va. at 97; *Massenburg*, 298 Va. at 217. The Parents' Complaint states that "the [ARP] Policy and the curriculum it mandates indoctrinate children in an ideology (sometimes called 'critical race theory,' 'critical theory,' or 'critical pedagogy') that views everyone and everything through the lens of race" and that the Albemarle Public Schools now "incorporate these pedagogical

teachings into the School District's programming and treat students differently based on race" through its ARC curriculum.

The Albemarle Public Schools acknowledge they began implementation of its ARC curriculum with its pilot program. Specifically, as the Complaint alleges, "Defendants implemented racially discriminatory curriculum at Henley Middle School on a 'pilot' basis, in the Spring of 2021." The Complaint further states that the "'pilot' basis" of the ARC is just the beginning, specifically alleging that "Defendants made clear in a 2020 report that they plan to implement substantially similar 'anti-racist' curriculum in 'all grades' and in multiple subject areas, including English, social studies, science, and math. They have already begun to do so." The Parents' Complaint asserts, "Defendants have started to implement, and are continuing to implement, [the ARC] in its English Language Arts (ELA) classes" and the Complaint also asserts, "Defendants have started to implement, and are continuing to implement, [the ARC] in their Social Studies classes." As an example of this widespread implementation of the ARC curriculum, in addition to the Albemarle Public Schools' own 2020 report, Parents allege in their Complaint that "Defendants bought copies of *Stamped: Racism*, *Anti-Racism, and You*, written by prominent critical theorists Ibram X. Kendi and Jason Reynolds, for every 11th-grade student." Parents further allege in their Complaint that at least two classes beyond the pilot program in Albemarle Public Schools were instructing students to focus on race, and Parents included in their pleadings two slides from those classes – one that Parents noted "highlighted the skin color of famous scientists" and another that "focused on the skin color of the main characters in 20 texts considered part of the current literary canon."

After asserting that Albemarle Public Schools have planned to continue implementing its ARC curriculum after the pilot program ended – and that Albemarle had already begun doing so

– the Complaint further alleges that three particular Student Plaintiffs are seeing portions of the ARC in their own classes. For example, the Complaint states:

> During the 2020-21 school year, Plaintiff L.R. was in seventh grade at Henley Middle School. As a seventh grader at Henley Middle School, L.R. participated in the pilot program created under the Policy. . . . As an eighth-grade student during the 2021-22 school year, L.R. has continued to receive similar race-based class instruction in several classes.

The Complaint makes similar allegations as to V.I. – who was in the same grade as L.R. – and as to P.M., who had just recently started high school in the Albemarle Public Schools at the time the Parents' Complaint was filed.

So as to provide further factual support for the widespread implementation of the ARC, Parents provided an electronic attachment of the Albemarle Public Schools' 2020-2021 ARP Evaluation Report in their Complaint. That report states, "In the calendar year ahead (2021-2022), we intend on addressing institutional and individual racism by implementing the following practices and projects:" including "the development of anti-racism lessons and alignment of all lessons to the Middle School Advisory Framework." The Advisory classes in Henley Middle School were where the ARC's pilot program had been rolled out in the 2020-2021 school year. As noted in their Complaint, on a call hosted by Henley Middle School Principal Beth Costa, Plaintiff Parents allege that one of Henley's Diversity Resource Teachers, Ms. Chris Booz, told parents that the ARC curriculum would be "woven through all the classes in Albemarle County." The Plaintiff Parents then allege in their pleadings that, even if parents wish to withdraw their children from the ARC instruction, the ARC curriculum would pervade "all content areas" of the Albemarle Public Schools' curriculum. Parents allege that would "mak[e] it impossible for parents to opt their children out of future racist lessons."

Unlike in *Lafferty*, these extensive allegations demonstrate that Albemarle Public Schools have thoroughly implemented its ARP Policy and ARC Curriculum. In *Lafferty* it was "not

clear" what the bathroom policies were even going to be (or how they would be implemented) – or if the plaintiff Jack would ever have to use the bathroom or locker room with a transgender student. Here, the Plaintiffs' Complaint was filed in December 2021, almost three years after the ARP was first adopted in February 2019, and a number of months after the ARC had first been rolled out during the Spring 2021 semester. During that time, as evident from the Parents' extensive allegations here, including those discussed *infra*, much of the ARP's implementation has already occurred, is also presently occurring, and the Albemarle Public Schools intend to continue to align all lessons throughout the curriculum with the ARC in upcoming semesters. Given all this, the Parents' claim that the ARC curriculum would continue after the eighth grade pilot program ended is certainly not a "purely speculative fact." *See Lafferty*, 293 Va. at 361.

However, the existence of a policy or curriculum that some find offensive is not by itself enough for would-be plaintiffs to have standing in a suit against a school board. To bring a claim for declaratory judgment, a plaintiff must allege at least a "substantial risk" or "likelihood of harm for purposes of standing." *Morgan*, ___ Va. at ___ (quoting *Driehaus*, 573 U.S. at 158). Therefore, this Court must review the Parents' pleadings for whether they allege a "likelihood" or "substantial risk" of a particularized continuing or future harm from the Albemarle Public Schools' ARP Policy and ARC Curriculum. *Id.* at ___.

### 2. Constitutional Harms

#### a. Religious Discrimination

Plaintiffs invoke the Constitution of Virginia's non-discrimination clause in Article I, § 11 for their religious discrimination claim. Unlike the Equal Protection Clause of the Fourteenth Amendment in the United States Constitution, which also prohibits discrimination, the Virginia Constitution's non-discrimination clause explicitly provides each person "the right to be free from any governmental discrimination upon the basis of *religious conviction*." Va.

Const. art. I, § 11 (emphasis added). As the Supreme Court clearly explained in its recently released decision in *Vlaming*, "Given Virginia's historic role in the protection of religious liberties, the provisions in the Constitution of Virginia have 'a vitality independent of the Federal Constitution.'" *Vlaming*, ___ Va. at ___ (quoting 1 A.E. Dick Howard, Commentaries on the Constitution of Virginia 303 (1974)). In addition, both the Virginia Supreme Court and the U.S. Supreme Court have clearly explained that "'[s]tate courts are absolutely free to interpret state constitutional provisions to accord greater protection' than federal-court interpretations of 'similar provisions of the United States Constitution.'" *Id.* at ___ (quoting *Arizona v. Evans*, 514 U.S. 1, 8 (1995)). While the Plaintiffs here do not rely on the free exercise and establishment clauses in Article I, § 16 of Virginia's Constitution, they do raise claims relying on Article I, § 11's prohibition against religious discrimination based on religious beliefs. These two sections of Article I are complementary to each other, and the rights protected in one are supportive of the similar rights in the other section that also protect the individual's right to hold and exercise sincerely held religious beliefs.[41] In short, when a government discriminates against people on the basis of religious beliefs, the government necessarily infringes on their constitutional right to freely exercise their religion. Consequently, we review the Plaintiffs' claim of discrimination

---

[41] The Plaintiff Parents have clearly argued (both below and on appeal) that their children are being discriminated against based on their religious convictions in violation of Article 1, § 11 of the Virginia Constitution. Article 1, § 11 explicitly prohibits "governmental discrimination upon the basis of religious conviction." Clearly, to apply the plain text of Article 1, § 11 to the facts alleged here, this Court must analyze whether the Albemarle Public Schools are infringing on the rights of students because of their religious convictions. For us to do so, this Court should certainly consult prior caselaw that has reviewed whether similar government actions and procedures to those alleged here have infringed on a person's right to freely hold and practice their religious convictions. Of course, government discrimination against a person's religious convictions affects that person's right to freely exercise his or her religious convictions. Therefore, despite the contention of the majority that we should not consider free exercise clause caselaw in conducting our analysis, to the contrary, we actually should not ignore cases that involve free exercise protections if the facts and rationale of those decisions are plainly applicable to the case now before us, which they are.

based on their religious beliefs through the prism of the Virginia Constitution's role in preserving citizens' religious freedom, and in doing that, we should also review U.S. and Virginia Supreme Court decisions that have wrestled with the limits of governmental power when dealing with religious liberties.

The Constitution of Virginia's clause prohibiting discrimination based on religious beliefs (in Article I, § 11), the Free Exercise Clause in the First Amendment and the Fourteenth Amendment's Equal Protection Clause all protect against government action that discriminates on the basis of religion. *See* Va. Const. art. I, § 11; *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam). Furthermore, the north star by which the U.S. Supreme Court has repeatedly navigated conflicts between government power and the Constitution's protections for citizens' religious convictions is the principle of neutrality. *McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844, 875 (2005); *Fulton v. City of Philadelphia, Pa.*, 141 S. Ct. 1868, 1878 (2021); *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 704 (1994) (explaining that "[t]he general principle that civil power must be exercised in a manner neutral to religion" is "well grounded in our case law").

Therefore, government policies must not disparage religious conduct or individuals, and instead must be generally tolerant and neutral towards religion. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022); *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) ("[T]he government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices."). The U.S. Supreme Court has explained that "Government fails

to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877.

For example, in *Masterpiece Cakeshop,* the U.S. Supreme Court held that a state adjudicatory commission was required to execute its policies and procedures in a manner that did not denigrate the appellant's religion. 138 S. Ct. at 1731 ("Here, that means the Commission was obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [appellant's] religious beliefs."). This principle of government neutrality towards religion certainly applies to public schools. The U.S. Supreme Court just recently overturned a school district's policies that were "not neutral towards religion." *Kennedy*, 142 S. Ct. at 2422-23 ("[T]he District's challenged policies were neither neutral nor generally applicable." (internal quotation omitted)). Therefore, I would hold that when a government body – including a school system – treats people differently based on their religion or acts with hostility toward a religion, that government body triggers review of whether its policies or conduct are unconstitutional. The court would then have to determine whether the school system is unlawfully discriminating against religion – i.e., whether that public school system engages in differential treatment of persons based on their religious convictions or engages in policies or conduct that is not neutral towards religion. *See id.*

Here, Plaintiff Parents allege in their pleadings that Albemarle Public Schools classify and discriminate on the basis of religion through their ARP Policy and their ARC curriculum. In their Complaint, Parents allege, "Defendants' curriculum discriminates on the basis of religion by teaching that Christianity is a 'dominant' 'identity' that has oppressed 'subordinate' 'identities' such as Islam, Buddhism, Judaism, other non-Christian religions, and atheism." In addition, Plaintiffs allege, "Defendants' curriculum instructs students to make daily choices to work against 'dominant' 'identities' such as Christianity," and Parents claim in their pleadings

- 73 -

that the ARC even implores students to "dismantle 'dominant culture,' which includes Christianity."

In short, according to the Parents' pleadings, the Albemarle Public Schools' ARC "instructed all students that to stop racism, they must work daily to dismantle the dominant white, Christian culture." As the Supreme Court has clearly stated, and in *Vlaming* again repeated, "Our standard of review requires us to assume as true each of [the Plaintiffs'] factual allegations and any reasonable inferences from those allegations" because the circuit court "ended this case at its earliest stage" after sustaining the School Board's plea in bar. *Vlaming*, ___ Va. at ___, ___. In fact, the Parents not only stated their allegations in their Complaint and other pleadings, they did so with specific facts and by attaching copies of the ARP Policy, ARC curriculum, and teaching materials to their Complaint. *Gray*, 276 Va. at 97; *Massenburg*, 298 Va. at 217. Reviewing the Parents' allegations here in this manner, the Albemarle Public Schools certainly do not treat religions neutrally. Not only does the U.S. Constitution prohibit both subtle and masked departures from neutrality, *Church of Lukumi Babalu Aye*, 508 U.S. at 534, it also prohibits blatant hostility to religion such as Parents allege to be the case here. Virginia's Constitution provides no less protection. Simply put, government-operated school lessons that encourage students to dismantle a religion and that denigrate religions (including Christianity) as racist are hostile acts against a religion and are, therefore, unconstitutional unless they pass strict scrutiny review. *See Kennedy*, 142 S. Ct. at 2422-23; *Mahan v. Nat'l Conservative Pol. Action Comm.*, 227 Va. 330, 336 (1984).

Therefore, taking the facts alleged in Plaintiffs' Complaint (and other pleadings) as true, the Albemarle Public Schools here have not been neutral but rather actually hostile toward a particular religion – Christianity. The pleadings, taken as true, demonstrate that the eighth grade ARC discriminates on the basis of religious conviction – and that the Student Plaintiffs will be

subject to a substantially similar curriculum in their upcoming semesters. Consequently, Plaintiff Parents have alleged and shown enough here that the circuit court should not have dismissed this case on the pleadings for lack of standing (or for failure to state a claim) when no *ore tenus* evidentiary hearing was held to determine the truth of how exactly the Albemarle Public Schools are treating their students – and whether that treatment violates their constitutional rights by engaging in religious discrimination in violation of Article I, § 11 of the Constitution of Virginia.

### b. Compelled Speech

As the Supreme Court just pronounced in its December 2023 decision in *Vlaming v. West Point School Board*, "It is a 'cardinal constitutional command' that government coercion, even when indirect, cannot constitutionally compel individuals to 'mouth support' for religious, political, or ideological views that they do not believe." *Vlaming*, ___ Va. at ___ (quoting *Janus v. American Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018)). As the Virginia Supreme Court went on to state in that very recent case, quoting the U.S. Supreme Court, "Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *Id*. (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023)); *see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995). The Supreme Court in *Vlaming* further stated, "'[I]f liberty means anything at all, it means the right to tell people what they do not want to hear.' All the more, it means the right to disagree without speaking at all." ___ Va. at ___ (internal citation omitted) (quoting *303 Creative*, 600 U.S. at 602).

A compelled speech claim, such as that which the Parents bring here, "challenges an attempt by the government to 'compel an individual to create speech [he] does not believe' and

to 'utter what is not in [his] mind about a question of political and religious significance.'" *Id.* at

___ (quoting *303 Creative*, 600 U.S. at 578-79, 596) (citations omitted); *see Hurley*, 515 U.S. at

573 (holding that government "may not compel affirmance of a belief with which the speaker

disagrees").[42]  Notably, as the Court also just stated in *Vlaming*, "[T]he government has a higher

burden to justify compelled speech than when it seeks to punish or to censor protected speech."

___ Va. at ___.

The Supreme Court declared that the right to freedom of expression is at its highest point

in compelled speech cases, that is, the right is "at its apogee." *Id.* at ___.  As the Supreme Court

thoroughly explained:

> "If there is any fixed star in our constitutional constellation, it is
> that no official, high or petty, can prescribe what shall be orthodox
> in politics, nationalism, religion, or other matters of opinion or
> force citizens to confess by word or act their faith therein." [*W.V.
> State Bd. Of Educ. v.*] *Barnette*, 319 U.S. [624,] 642 [(1943)] . . . .
>
> "Forcing free and independent individuals to endorse ideas they
> find objectionable is always demeaning, and for this reason, one of
> our landmark free speech cases said that a law commanding
> 'involuntary affirmation' of objected-to beliefs would require
> 'even more immediate and urgent grounds' than a law demanding
> silence." [*Janus*, 138 S. Ct.] at 2464 (citation omitted).

*Id.* at ___.

As the Supreme Court unequivocally emphasized:

> Forcing creedal conformity is more pernicious than silencing
> dissent because the former seeks to monopolize the marketplace of
> ideas by making everyone in the market say the same thing about

---

[42] The U.S. Supreme Court's caselaw on claims related to compelled speech applies to this case because the Supreme Court of Virginia has generally described Article I, § 12 of our Constitution as "coextensive with the free speech provisions of the federal First Amendment." *Elliott v. Commonwealth*, 267 Va. 464, 473-74 (2004); *Cross*, 2021 WL 9276274, at *6 (Va. Aug. 30, 2021).  In *Vlaming*, the Court said that the protections for free speech in Article I, § 12 of the Virginia Constitution are at least as great as those in the Free Speech Clause of the First Amendment of the U.S. Constitution. *Vlaming*, ___ Va. at ___ ("To be sure, in some cases, we might find that the Virginia constitutional right of free speech is stronger than the prevailing interpretation of the First Amendment by the United States Supreme Court.").

the same idea. *See* [*Janus*, 138 S. Ct.] at 2464 ("When speech is compelled, . . . additional damage is done.").

*Id.* at ___.

In *Vlaming*, the plaintiff teacher alleged, among other claims, that the defendant school board had sought to compel his speech in violation of his rights under Article I, § 12. Specifically, Vlaming alleged that he was fired from his job as a French teacher "because he had refused to affirmatively use a masculine pronoun to refer to Doe, a biologically female student." *Id.* at ___. Vlaming claimed that "using male pronouns to refer to a female was against his religious beliefs." *Id.* at ___.

The Supreme Court held that, even for a schoolteacher who must teach the class that the school system has paid him to teach, a school board's attempt to compel that teacher to speak (or to remain silent) on the divisive issue in that case "would cast 'a pall of orthodoxy over the classroom' on a topic that has 'produced a passionate political and social debate.'" *Id.* at ___ (quoting *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021)). The Court explained, "The concept of 'gender identity' is among many 'controversial subjects' that are rightly perceived as 'sensitive political topics.'" *Id.* at ___. Furthermore, the Supreme Court recognized that "the compelled speech in Vlaming's case involves an ideological topic that has engendered fierce public debate" and that "[f]rom courts to schoolrooms this controversy continues." *Id.* at ___. The Court further explained that Vlaming, even as a hired schoolteacher, had the "right not to be compelled to give a verbal salute to an ideological view that violates his conscience" in refusing to use pronouns to refer to a student in a French class. *Id.* at ___.

Public school students generally, of course, enjoy a right against compelled speech. *Id.* at ___, ___, ___. Indeed, as the Court explained in *Vlaming*, the need to reinforce principles against compelled speech "is nowhere more vital than in the community of American schools," and "teachers and students do not 'shed their constitutional rights to freedom of speech or

expression at the schoolhouse gate.'" *Id*. at ___ (first quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960); and then quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist*., 393 U.S. 503, 506 (1969)). Certainly, public schools must not require students to declare an "affirmation of a belief and an attitude of mind." *Barnette*, 319 U.S. at 633. Such compelled speech is what the Plaintiff Parents allege to be the case in the appeal now before this Court.

When reviewing the Plaintiffs' claims here, this Court must, as the Supreme Court did in *Vlaming*, accept their pleadings as true for purposes of reviewing this plea in bar and demurrer on appeal – and also accept as true any reasonable inferences from those allegations. ___ Va. at ___; *Massenburg*, 298 Va. at 217; *Morgan*, ___ Va. at ___. One allegation readily communicated by the pleadings is that Albemarle Public Schools' definition of "anti-racist" is far broader than the seemingly virtuous label implies. For example, the Plaintiff Parents allege in their Complaint that the Albemarle Public Schools' ARC tells students:

> "remaining apolitical," believing that "we all belong to the human race," and taking certain positions on such controversial political issues as school funding, immigration policy, and criminal justice reform constitute racism and must be contested for one to be "anti-racist."

As to harm, Plaintiff Parents argue on appeal that the Albemarle Public Schools compel speech "by forcing students to affirm the School Defendants' political ideology, while threatening punishment for noncompliance." Parents allege in their Complaint that the Albemarle Public Schools' ARC "require[s] students to declare and affirm how they will look, think, sound, and act 'more anti-racist,'" and the Parents attached slides to the Complaint that indeed call on students to utter those declarations at school. Parents further allege in their Complaint that the ARC instructs students "that [it] is not enough to simply be NOT racist. We must be anti-racist." Furthermore, the pilot ARC states, "In the absence of making" choices that the ARC considers "anti-racist," students "(un)consciously uphold aspects of white supremacy."

Given all this, the present facts as pleaded by the Plaintiff Parents support their claim that the Albemarle Public Schools are effectively "forcing students to embrace beliefs and affirm messages with which they do not agree."

In addition, the Parents claim in their Complaint, "Defendants have told all Albemarle School students, including Plaintiffs, that failure to embrace 'anti-racist' beliefs and take actions consistent with those beliefs constitutes racism," for which students are "subject to the pains of discipline and lower academic ratings." As the ARP Regulations provided in the attachments to the Complaint state, "When school administrators determine a student has committed a racist act," the student will face what Plaintiffs allege in their Complaint to be "a sliding scale of discipline." The ARP Regulations list "such practices as restorative justice, mediation, role play, or other explicit policies or training resources" as consequences for committing what it refers to as "a racist act." Viewing the factual allegations in their most favorable light, the reference to "other explicit policies" includes the Student Conduct policy, and these measures, such as "mediation" and "restorative practice[s]," are forms of discipline used by the Student Conduct policy alongside detention, in-school suspension, and expulsion.

In the ARP's own listed consequences, such as mediation, the student would have to be singled out, at a minimum, and accused of having committed such an act – anything the "school administrators determine" to be "a racist act" – and thereby labeled a racist who then would engage in role play (either with other students or staff or both) as part of the punishment. The ARP Regulations describe these consequences as the student "be[ing] provided the opportunity to learn about the impact of their actions on others." However, simply accusing and labeling someone as racist among their peers, especially students who are minors who are in middle school and high school, is a significant punishment in itself along with the ostracism such an extremely derogatory label is almost certain to entail.

- 79 -

Furthermore, Parents attached to their Complaint and described to the circuit court during oral argument the Albemarle Public Schools' plan to record these infractions with an "ARP" code – and alleged to the circuit court that this plan reveals the Defendants' intent to discipline students who violate the ARP. In the "Anti-Racism Policy Evaluation Report" dated "November 2020," the Albemarle Public Schools announced that "the division has made significant changes to the ACPS Behavioral Management Handbook, including: . . . a new section that describes the division's Anti-Racism Policy¸ along with a new abbreviation, ARP, *which will be added to behavior infractions that appear to violate the Anti-Racism Policy*." (Emphasis added). Whether the "ARP" infraction code is sent with student records to the Albemarle Public Schools headquarters to be filed with the Superintendent's Office, or whether the record of the infraction remains in the school where the infraction was committed, the "ARP" code still represents a cited infraction for which a student faces discipline – even if that discipline is role play with only one or two student peers or the teacher. The majority prefers to ignore the existence of the ARP infraction code in the Albemarle Public Schools' ACPS Behavioral Management Handbook. This ARP infraction code was also explicitly described in the Albemarle Public Schools' own 2020 report attached to the Complaint and can certainly be considered by us (and the circuit court), especially here where the Parents repeatedly allege that students can be disciplined for what the school considers to be racist behavior. In addition, an appellate court is not required to abandon common sense when looking at the record before it. The School Board created the ARP infraction code so that it could be recorded. The logical conclusion to a disciplinary policy that already has an identifiable infraction code (ARP) for certain violations is that the Albemarle Public Schools System plans to discipline students for violating that policy.

Racism is unquestionably a terrible thing, and being labeled as a racist is not only a rightly pejorative description but also a label that can cause considerable opprobrium to a

student's or parent's reputation along with the lifelong penalties that accompany that labeling or statement in the student's record. Any record of a student saying what the Albemarle Public Schools System considers a racist thing or doing what Albemarle Public Schools considers a racist act could be extremely detrimental, if not fatal, when applying to colleges, if any such record is formally or even informally made known to the college.

Notably, in support of their compelled speech claim, the Plaintiff Parents allege in their Complaint that (1) "Defendants tell students it 'is not enough to simply be NOT racist'"; (2) "they 'MUST be anti-racist'"; (3) "they [the Albemarle Schools] have labeled dissent and disagreement as 'racism'"; (4) the Albemarle Public Schools teach that "'remaining apolitical,' believing that 'we all belong to the human race,' and taking certain positions on such controversial political issues as school funding, immigration policy, and criminal justice reform constitute racism"; and (5) "Having recharacterized dissent and disagreement as racism, Defendants threaten to discipline students for committing such supposedly 'racist' acts." In short, the Complaint alleges:

> Taken together then, according to Defendants, the only way to escape the pejorative "racist" label is to actively support the [ARC's favored] ideas. . . . This includes opposing what Defendants deem "privileged" and "dominant culture"— "white," "upper-middle class," "Christian," "able-bodied," "heterosexual," "cisgender," and male.

(Quoting the ARC in the Complaint). As stated *supra*, in this appeal of a plea in bar, "[t]he facts as stated in the pleadings by the plaintiff[s] are taken as true." *Gray*, 276 Va. at 97. Therefore, according to the Parents' Complaint, the ARP and ARC expect and implore students to affirm its ideological tenets, and, according to the Plaintiffs' Complaint, failure to do so leaves students at risk of being labeled as a racist by the Albemarle Public Schools.

In other words, Plaintiff Parents allege that the Albemarle Schools compel students to "'mouth support' for religious, political, or ideological views that they do not believe." *Vlaming*,

___ Va. at ___ (internal quotations omitted). The Albemarle Public Schools, as *Vlaming* now reminds us, "has no inherent power to declare by ipse dixit that controversial ideas are now uncontroversial." *Id*. at ___. Compelling the Plaintiff Students here to parrot the school system's views on controversial political issues and social issues (such as adopting certain positions on immigration and on criminal justice policy), as Plaintiffs alleged, would "cast 'a pall of orthodoxy over the classroom' on a topic that has 'produced a passionate political and social debate.'" *Id.* at 56 (quoting *Meriwether*, 992 F.3d at 508). As the Supreme Court emphasized, "[T]he 'freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.'" *Id.* at ___ (quoting *Barnette*, 319 U.S. at 642).

The Parents' Complaint also describes the Albemarle Schools' actions as "forcing students to embrace beliefs and affirm messages with which they do not agree." Such actions, if true, would certainly compel student speech in violation of the free speech provisions of the Virginia Constitution. *See Hurley*, 515 U.S. at 573 (holding that government "may not compel affirmance of a belief with which the speaker disagrees"). In other words, the Parents' allegations that their children faced disciplinary consequences for refusing to affirm the ARP's ideology, "when placed in the context of all other supporting facts and supporting inferences in [the Parents'] [59]-page complaint, asserts a prima facie claim" of compelled speech. *Vlaming*, ___ Va. at ___.

Plaintiffs do not make as strong and specific arguments in the second count of their Complaint alleging unconstitutional actions based solely on viewpoint discrimination that are as clear about how their children are being harmed – or have a substantial risk of being harmed – as they do allege under discrimination based on race, discrimination based on religious beliefs, and on compelled speech. In short, the sections of the Complaint and the pleadings that allege

viewpoint discrimination are not nearly as clearly pled as the sections of the Compliant and the pleadings that allege discrimination based on race (as discussed *infra*) or on religion and that allege compelled speech. Indeed, any or all of the allegations under those three areas, if true, would be a violation of Article I of the Virginia Constitution. The allegations of viewpoint discrimination, however, are much more general. And Plaintiffs have not clearly shown that, even if their allegations that minors in high school, middle school, and even elementary school feel uncomfortable speaking out and disagreeing with their teachers, principal, or superintendent, that therefore their constitutional rights under Article I, § 12 have been violated. It is not enough that Plaintiff Students simply disagree with the Albemarle Schools' policies and feel uncomfortable saying so. Consequently, I do not believe that it has been sufficiently pled that I can say that the circuit court necessarily erred in dismissing that one count of the Plaintiffs' Complaint. Much of what Plaintiffs claim to be viewpoint discrimination in Count Two of their Complaint is actually requiring students to say or parrot certain things and, therefore, is compelled speech. However, other points raised in that section of the Complaint entitled "Viewpoint Discrimination" are quite vague. What would violate Article I, § 12 of the Virginia Constitution is the students' being *compelled* to say or agree with certain ideas and tenets of the ARC curriculum. In short, while Plaintiffs have not properly pled a viewpoint discrimination claim as violating students' constitutional rights, they have indeed properly pled a compelled speech claim sufficiently that the circuit court erred when it dismissed the Plaintiffs' count in their Complaint alleging compelled speech without holding an *ore tenus* hearing.

### c. Racial Discrimination

The Plaintiffs allege that they are being harmed by Albemarle Public Schools' racial discrimination – and that this discrimination violates Article I, § 11 of the Constitution of Virginia. The Supreme Court of Virginia has stated in *Wilkins*, a race-based discrimination case,

that Article I, § 11 is "congruent with the federal equal protection clause."  264 Va. at 467.

Consequently, I "apply the standards and nomenclature developed under the equal protection

clause" to the racial discrimination claim now before us.  *Id.*

The U.S. Supreme Court has repeatedly held (and reaffirmed just last year), "The central

purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of

official conduct discriminating on the basis of race."  *Students for Fair Admissions, Inc. v.*

*President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2161 (2023) (quoting *Washington v.*

*Davis*, 426 U.S. 229, 239 (1976)).  The U.S. Supreme Court has further stated, "Express racial

classifications are immediately suspect" and "the Equal Protection Clause demands strict

scrutiny of all racial classifications."  *Shaw v. Reno*, 509 U.S. 630, 642-43, 653 (1993).  The

types of official conduct that fall under equal protection review are expansive and include even

"so-called benign racial classifications."  *Johnson v. California*, 543 U.S. 499, 505 (2005)

(where the U.S. Supreme Court clearly stated, "We have held that '*all* racial classifications

[imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny.'"

(alterations in original) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995))).

In short, as the Supreme Court recently emphasized, "Eliminating racial discrimination means

eliminating all of it."  *Fellows of Harvard Coll.*, 143 S. Ct. at 2161-62.

Furthermore, to show standing for declaratory relief, a plaintiff raising an equal

protection claim based on racial discrimination must show that he is in danger of being subject to

the challenged policy or conduct that treats people differently based on their race.  Therefore, to

have standing to bring the declaratory judgment claims based on the alleged equal protection

violations here, the Parents must have alleged that their children faced a "substantial risk" of

being treated differently by the Albemarle Public Schools based on their race – or that the

Albemarle Public Schools' racial classifications otherwise presented the Parents with a "likelihood of harm for purposes of standing." *Morgan*, ___ Va. at ___.

Here, Plaintiff Parents allege that students are harmed by the ARC curriculum because the Albemarle Schools trained its teachers to implement the ARC using race-based methods, and the Parents allege that the ARC curriculum itself treats students differently based on their race. At the outset, the Parents assert in their Complaint that the ARC curriculum's foundational definition of racism applies unequally to students depending on the student's race. The Complaint states that the ARC considers racism to be "the exercise of power by *one specific racial group* ('white people') to oppress and marginalize other racial groups using the mechanism of a 'socially constructed racial hierarchy.'"

Parents then allege in their Complaint that the Albemarle Public Schools put its teaching staff through mandatory ARP training sessions. In their pleadings, the Plaintiff Parents allege that "Defendants [Albemarle Public Schools] mandated staff training on the [ARP] Policy, which included urging teachers to implement and incorporate into their classroom instruction an ideology (sometimes called critical theory, critical race theory, or ideology) that is intolerant of dissent, advances racial stereotypes, and treats students unequally based on their race or religious beliefs." According to the Parents' Complaint, in this training, Albemarle Public Schools teachers were told, "You are either a racist or an anti-racist" and were also told to "just get off the bus" and essentially consider finding a different job if they disagreed.

After the initial orientation on the ARP, Plaintiffs allege, "Defendants conducted many trainings and exercises in which Defendants clarified their intent that teachers and staff implement their [ARP] Policy by fostering racial stereotypes, mandating extreme race consciousness, and treating people differently based on race." This training included, according to the Complaint, a "mandatory Division-wide professional development webinar session"

discussing *Courageous Conversations About Race*, a book that "advocate[s] differential treatment based on race." Plaintiffs allege that Albemarle Schools followed this up with a monthly teacher training on how to instruct students using the same book and that "[t]he training further promoted racial stereotypes and advocated differential treatment based on race." For example, the staff training materials attached to the Complaint explained, "White culture is characterized by individualism" and a "desire for private property/individual ownership versus collectivist culture of shared property/group ownership." These training materials also, according to the Plaintiff Parents, "characterize some communication methods – 'verbal,' 'impersonal,' 'intellectual,' 'task oriented' – as exclusively 'white talk,' implying that people of color do not, and cannot be expected to, communicate in these ways." In contrast, the Plaintiff Parents allege that the Albemarle Public Schools' training for teachers and staff "characterize other communication methods – 'nonverbal,' 'personal,' 'emotional,' and 'process oriented' – as 'color commentary.'"

In addition, Plaintiffs attach to the Complaint a document that appears to be the Albemarle Schools' draft "ELA Toolkit" for training Albemarle Public Schools staff how to teach English/Language Arts classes in compliance with the ARP Policy. Plaintiffs aver that the draft English/Language Arts Toolkit was based on the book, *Letting Go of Literary Whiteness: Antiracist Literature Instruction for White Students*, which "coach[es] teachers to focus on Whiteness, White Privilege, and White-Dominant Culture as they teach White Students." The Toolkit further tells Albemarle Public Schools teachers, "An anti-racist pedagogy begins when educators and students engage in self-reflection about what it means to be white."

After alleging in their Complaint that the ARC-trained teachers were trained to treat students differently based on race, the Plaintiff Parents also allege that the ARC curriculum itself classifies and treats students differently based on race. Plaintiffs claim that the "'[ARC] pilot

program at Henley Middle School in Spring 2021 . . . classified students based on racial groups and told students that all people are either perpetually privileged oppressors or perpetually victimized members of the oppressed group." Plaintiffs allege in their Complaint that the ARC curriculum "asserted that it is 'challenging for white people to think about (and do something about) white privilege.'" Plaintiffs further allege that the ARC "assign[s] one amorphous group (white people) as oppressors and dominators, and another (non-white persons) as oppressed or subordinate" – and that the ARC implied that "for non-white students, their skin tone does make their life harder, and it is a nearly insurmountable obstacle to achievement." Parents also state in their Complaint that the ARC curriculum compared Caucasians to "a 'person [who] chose the game and the rules . . . daily,' so that person 'won the game each time.'"

The Parents' Complaint further alleges that, specifically, "the program instructs white students that if they fail to adopt and forcefully advance a radical ideological political program, they are racist, *regardless* of whether they individually harbor any racial animus or bias." In short, taking the Parents' allegations as true for the purposes of this appeal, the Albemarle Public Schools – through its teacher training and ARC curriculum – handled students differently based on their race and the color of their skin in violation of the students' rights against discrimination by their government under Article I, § 11 of Virginia's Constitution.

D.  The ARC Curriculum's Effect on Students

The Plaintiff Parents contend in their Complaint that their children have suffered, and will continue to suffer, significant harm because of the Albemarle Public Schools' "policies and practices that inculcate hostile racial stereotypes and treat students differently based on race." According to the allegations of the Parents' pleadings, the Albemarle Public Schools call on students to "work daily to dismantle the dominant white, Christian culture." They claim in their Complaint and its attachments that the Albemarle Public Schools also "[seek] to compel

Plaintiffs to speak racial and political messages with which they disagree and to compel speech based on content and viewpoint," where students who refuse to do so risk being labeled as a racist and subject to discipline – including having an infraction code, "ARP," recorded against them. Furthermore, the Parents allege that Albemarle Public Schools "conducted many trainings and exercises in which [the Albemarle Schools' leadership] clarified their intent that teachers and staff implement their [ARP] Policy by fostering racial stereotypes, mandating extreme race consciousness, and treating people differently based on race." In addition, the Complaint alleges, that the ARC "program instructs white students that if they fail to adopt" the ARC's ideological tenets, "they are racist, *regardless* of whether they individually harbor any racial animus or bias."

Furthermore, Parents stated in their Complaint that, other than taking their children out of the public school system, they have no genuine ability to "opt out" their children from this instruction because the ARP Policy and its ARC curriculum is "woven through all the classes in Albemarle County." Plaintiffs supported these claims in a number of ways: with allegations detailing what their children have experienced or are experiencing, by recounting the parents' own conversations that they have had with Albemarle Public Schools staff, including a school principal, and, most predominantly, by attaching to their pleadings the Albemarle Public Schools' own documentation extensively detailing its ARP policy and ARC curriculum, the past and planned implementation of the ARP and ARC, and its ARC curriculum materials.

A student who was personally subjected to the differential treatment or compelled speech that Plaintiffs allege here (or who was otherwise particularly harmed by unconstitutional conduct by the Albemarle Public Schools) would have standing to bring a claim for damages. The standard to bring a claim seeking *declaratory relief* for these alleged violations is lower, given that Virginia's Declaratory Judgment Act provides relief "without requiring one of the parties

interested so to invade the rights asserted by the other." *Berry*, ___ Va. at ___ (quoting Code § 8.01-191). Consequently, any particular student who faces a "substantial risk" or "likelihood" of harm from constitutional violations by the Albemarle Public Schools has standing to bring a claim for declaratory relief. *See Morgan*, ___ Va. at ___.

According to the Parents' pleadings, in their upcoming semesters the Student Plaintiffs in this case will face the same Albemarle Public Schools policies and curriculum that have already, as Plaintiffs allege, violated the constitutional rights of students in the Albemarle Public Schools. Plaintiffs allege that at the time that they filed the Motion for Preliminary Injunction, the Albemarle Public Schools had already begun adding the lessons from the pilot ARC curriculum to "every subject and grade level," especially in English/Language Arts (which is a required subject in each year of school that students must pass) and in Social Studies. The Plaintiff Parents also specifically allege that the student plaintiffs, particularly eighth grade students L.R. and V.I., would now "receive the eighth-grade curriculum that was used in the pilot program." Plaintiffs emphasized in their Complaint, "The policies and practices that led to the violation of Plaintiffs' constitutional and statutory rights remain in effect." In their December 22, 2021 Complaint, Plaintiffs also aver, "Defendants will implement similar policies and practices under [the ARP] and its regulations division-wide at the beginning of the Spring 2022 semester." They further emphasize, "Plaintiffs understand that under the [ARP] Policy, racial stereotypes and disparate treatment based on race will impact every class and subject area taught in Albemarle Public Schools making it impossible to effectively opt out of the [ARP] Policy implementation."

These allegations do not even rely just on the Parents' observations. Albemarle Public Schools' own ARP Evaluation Report for the 2020-2021 school year, which was referenced as an electronic attachment in the Complaint, announced that Albemarle Public Schools planned for the "alignment of all lessons" to the framework of the eighth grade pilot ARC. As Diversity

Resource Teacher Ms. Chris Booz told parents during a call hosted by Henley Middle School Principal Beth Costa, the ARC curriculum would be "woven through all the classes in Albemarle County" and that even if parents withdrew students from Advisory classes, the ARC curriculum "will impact *all* curriculum subject areas." Under these circumstances, I would hold that the Student Plaintiffs here face at least a "substantial risk" of undergoing the same ARC curriculum that has already resulted in alleged constitutional violations – especially L.R. and V.I., who at the time the case was filed had just begun the eighth grade at the same middle school where the eighth grade pilot ARC had been conducted. *See Morgan*, ___ Va. at ___.

Of course, if the Parents had waited to file their Complaint until after the Spring 2022 semester – after the point at which they allege the Albemarle Public Schools would implement the ARP and ARC "division-wide," the Parents could well show even more examples of harm. But why should the Parents have to wait for their children to receive even more of this alleged unconstitutionally discriminatory treatment that L.R., V.I., P.M., and others have claimed that they have already been receiving? So that the Plaintiff Parents would have even more examples of yet more harm that their children have had to endure? It is also quite likely that more evidence would have come out if the circuit court judge had actually had an *ore tenus* hearing, where testimony would have been taken and additional evidence admitted, before he dismissed the Complaint. However, he never had such a hearing where testimony was taken and evidence was admitted. In my view, there is already enough in the Complaint and its attachments (let alone in the other pleadings), which all must be taken as true at this stage, to require the circuit court to at least have an *ore tenus* hearing to determine whether the constitutional rights of these children and their parents have indeed been violated. In short, given that the facts as alleged by the Parents are sufficient to recognize that these parents and students have standing and have adequately stated a claim for declaratory or injunctive relief, it was error for the circuit court to

dismiss this Complaint with prejudice without taking testimony and evidence to determine the truth of the Plaintiff Parents' claims.

### E. The Effects of the ARC Curriculum on P.M., V.I., and L.R.

In addition to seeking to prevent this future discrimination and harm to students, Parents allege in their Complaint and other pleadings that several Student Plaintiffs have already been particularly harmed by the ARC curriculum, and Parents claim that these sorts of harm will continue to plague the Student Plaintiffs if they are not granted some declaratory and injunctive relief against the ARP Policy and ARC curriculum.[43]

For example, Plaintiffs allege in their Complaint that, while P.M. was attending Henley Middle School and his class was discussing the roles of men and women, P.M. was accosted and bullied by other students for simply respectfully sharing his Catholic beliefs, including being attacked via a hostile email sent to P.M. by another student. Indeed, this attack on P.M. only occurred, according to the Complaint, after Albemarle Public Schools "adopted and implemented" the ARP Policy, which taught and encouraged students through lessons in the ARC curriculum to oppose and seek to dismantle what Albemarle Schools deem "'privileged'

---

[43] Here, Plaintiffs submitted their pleadings (that included the parents' affidavits) to the circuit court before the motions hearing, and the Plaintiffs argued to the circuit court by relying in part on those affidavits. During the hearing, the circuit court stated that it had "read all of the papers" filed in the case, and, in its final order, the circuit court stated that it had considered "all of the pleadings." On brief to this Court, the Plaintiffs quoted from the parents' affidavits and relied on them for their statement of facts. The Plaintiffs did state, in a footnote in their opening brief, that for purposes of their standing arguments, caselaw indicated that only the Complaint and its attachments could be reviewed. At best, however, this is merely a concession of law. As the Supreme Court has stated, "a party cannot concede the law." *CVAS 2, LLC v. City of Fredericksburg*, 289 Va. 100, 117 n.5 (2015); *Alexander v. Cobb*, 298 Va. 380, 388 (2020).

As the Supreme Court has also made clear (as we note *supra* in Part II(A)), in considering a plea in bar, which is how the circuit court decided five of the six counts of the Plaintiffs' Complaint, the circuit court should consider all the pleadings and the attachments to those pleadings. The Parents' affidavits were attachments to those pleadings – and are appropriately in the record before this Court. Contrary to Plaintiffs' footnote, we should consider them, and I do (as the circuit court also must).

and 'dominant culture' — 'white,' 'upper-middle class,' 'Christian,' 'able-bodied,' 'heterosexual,' 'cisgender,' and male." The affidavit of P.M.'s mother, which was attached to the pleadings, elaborated on this allegation in the Complaint, and stated that this attack only occurred after an ARC lesson that encouraged students to "dismantle 'racist' systems, including Christianity" – a lesson that was "denigrating many of P.M.'s own Christian beliefs." However, as P.M.'s mother states, when she and P.M.'s father complained to Principal Beth Costa about the bullying their son had received:

> Principal Costa did not address the email at all but said that the school would need to investigate P.M. for what he did to trigger such a response. Even after investigating, speaking with the teacher, and agreeing that P.M. had answered another student's questions in a very respectful way, Principal Costa's focus stayed on P.M. She told Matt [P.M.'s father] and I that we needed to "coach" our son on how to share his beliefs as if him stating his differing view was the problem.

> To the best of my knowledge, the school never disciplined the other student for her hateful email to P.M. even though the incident happened over school email, was independently verifiable, and the school has a strict no-bullying policy.

As noted in the Complaint, P.M.'s parents subsequently withdrew P.M. due to the discrimination and also due to the "hostile educational environment" that they allege was created by the ARC curriculum in Albemarle Public Schools.

Similarly, Plaintiffs allege in the Complaint that V.I. was harmed by the ARP and ARC – and that, given the ARC curriculum, V.I. would continue to be harmed during her eighth grade year. Describing the ARC lessons on race and identity as "confusing and at times disturbing" for V.I., Plaintiffs assert in their Complaint that under the ARC, "teachers instruct students to embrace an ideology that sets out 'White' and 'Christian' culture as 'dominant' and all other cultures as 'subordinate.'" For example, the Complaint alleges:

> V.I. was shown a video as part of classroom instruction that told her people of color could not live in big houses. V.I. is Latina and

has watched her parents run a successful business after immigrating to the United States from Panama. This instruction at school, and the message it sent about her identity, made her feel confused and upset. And the lesson disturbed her because it instructed her that her achievement in life will turn on her racial background, not her hard work.

V.I.'s father, Dr. Carlos Ibanez, reiterated V.I.'s experience in his affidavit:

> One day near the end of the pilot program, V.I. called her mother from school upset and confused. She was still upset when I talked with her that evening. As part of the Policy-based instruction in her [English/]language arts class, V.I. was shown two videos. Both upset and confused her.
>
> The first video, entitled *Intersectionality 101* . . . indicated that students of color cannot live in big houses, and that their parents can't go to good schools or have successful careers, because those things are possible only for white families in America. . . . V.I. was upset that the school would suggest to her she could not succeed in her life because she is Latina.

The second video, according to the father, presented a "negative and distorted depiction of" Catholicism that "denigrated her [V.I.'s] Catholic faith." As the Plaintiff Parents express in their Complaint, V.I. does not know where she fits into the "new 'anti-racism' ideology" because her racial background would render her underprivileged by the ARC curriculum's standards, while her religious beliefs and economic status would suggest privilege instead. Dr. Ibanez then disclosed in his affidavit:

> I took my concerns to my daughter's teacher, Chris Booz. I explained, as a person of color, that what was being told to my daughter in that first video was racist. And the content in the second video was hostile to our faith. I wanted to understand the pedagogical thinking behind the decision to show these videos, and I wanted to know if my children would continue to encounter this racist (and anti-Catholic) message at school. Ms. Booz dismissed my concerns and told me that the School District's "Anti-racism" Policy and its curriculum (including these videos) were what students needed to see.

"For example," V.I.'s father alleges, the ARC "teaches [V.I.] that because she is Latino she is 'subordinate' and therefore oppressed by white students. It also says that because she is

Christian, she is part of the 'dominant' culture." V.I.'s father further avers that the ARC "requires my children to work to dismantle 'dominant culture,' which includes Christianity. The Policy pushes my children to agree with and affirm an 'anti-racism' ideology." Dr. Ibanez alleges that the ARC itself "is racist and denigrates our family's religious beliefs." Finally, V.I.'s father explains that without judicial relief, "the District will continue discriminating against my children for their race, background, and religious beliefs."

The Plaintiff Parents' pleadings also allege how the racial classifications in the Albemarle Public Schools have particularly affected L.R. – a student with a mixed racial heritage. The Plaintiff Parents allege in the Complaint that L.R.'s mother "is concerned that the Policy and related curriculum encourage children to focus on race in a way that makes L.R. uncomfortable and will put false ideology in his mind about being targeted because he is black." L.R.'s mother elaborates in her affidavit attached to the pleadings that under the Albemarle Public Schools' ARC, L.R.'s white peers are "labeled 'privileged' and 'oppressor,'" while L.R. is taught that in America's culture he is "'subordinate' to his white peers just because his father is black." The Parents also allege in their Complaint that "L.R.'s teacher told [L.R.'s mother] that the school planned to create a 'safe space' for students of color separate from white students in the advisory classes where the pilot program would be taught." The Parents later explain that the ARP and ARC curriculum encourage teachers to "treat L.R. differently than other children because of his [mixed] racial heritage" – and that Henley Middle School staff shared with L.R.'s mother their plan "proposing segregation during certain class times." Whether these allegations have any truth to them was not decided below because no full *ore tenus* hearing was held by the circuit court to take testimony and to admit evidence and to consider objections to evidence. Therefore, as noted *supra*, on review of this matter on appeal, this Court must consider these allegations as

true for purposes of ruling on whether the circuit court erred in dismissing this case with prejudice. *Vlaming*, ___ Va. at ___, ___, ___; *Gray*, 276 Va. at 97.

L.R.'s mother, Melissa Riley, further alleges that under the Albemarle Schools' ARP and ARC curriculum, L.R. is being "taught that what he can achieve in life is based on his skin color." The Plaintiff Parents further allege that L.R. is being taught that, under America's culture, he is "'subordinate' to his white peers." L.R.'s mother despairingly avers that this "is a message I see him [L.R.] now taking to heart." She states that the ARC is also making L.R. "feel singled out or uncomfortable because of his race." Ms. Riley alleges that the Albemarle Schools' ARP and the ARC curriculum risk causing L.R. to "see either side of his family as negative or 'different'" given that "L.R. is white/Native American from [his mother's] side of the family and black from his father's side of the family." The pleadings also allege that the ARP "has damaged [his mother's] efforts" "to show [L.R.] that his biracial heritage is wonderful, and that there is tremendous value in both sides of his family." The pleadings further state that, since L.R. started the eighth grade curriculum, he would "voice negative thoughts or even joke about being black" – and that "[w]hen something he does not like happens to him, he will now say, 'It's because I'm black, isn't it?'" Indeed, the Complaint specifically alleges, "Since the School District implemented the [ARP], Riley [L.R.'s mother] has heard her son joke about and discuss his race in a negative way that she never observed him doing before the School District started implementing the [ARP]." The pleadings allege that L.R. "now sees himself as 'different' than his white peers" and that L.R. finds that this has separated him to some degree from his white classmates and friends in a way that he had not felt or experienced before the ARC curriculum.

The Plaintiff Parents allege that Albemarle Public Schools staff were "proposing segregation during certain class times," when some of the ARC curriculum was taught. The pleadings further claim that "the plan to separate students by race would also create different

learning environments and different discussions for students based on race." Both Ms. Riley's affidavit and the Complaint allege that she had a conversation with L.R.'s teacher, Chris Booz, during which Ms. Booz "explained to [Melissa Riley] the school's plan to create a 'safe space' for students of color to go and be away from white students during these 'anti-racism' lessons." Ms. Riley stated in her affidavit that she "was alarmed at the school's proposed solution. It's racial segregation." She further alleges that Ms. Booz told her that racially separating the students "would be a chance for students of color to talk about how they felt about racism separate from the white students." Plaintiffs also allege that Melissa Riley, who was still greatly alarmed that "the district planned to implement the 'Anti-racism' Policy differently depending on whether the student was white or whether he or she was a student of color," asked Henley Middle School Principal Beth Costa how she planned to implement the Albemarle Public Schools' ARP without harming students like L.R. and causing them "to see their racial heritage as a negative." Riley alleges that, in response to these questions, "Principal Costa conceded that the school could not prevent any of the harms I raised. Principal Costa explained that the district would have to try different approaches, including 'safe spaces,' and see if they worked."

These allegations in the Parents' pleadings are not "ingenious academic exercise[s] in the conceivable" that are unmoored from concrete facts. *See Morgan*, ___ Va. at ___ (internal quotation omitted). As I have just noted in this dissent, Melissa Riley recounted particular conversations between herself and the Albemarle Public Schools staff, including the principal of her son L.R.'s middle school, Beth Costa. Furthermore, as stated in the Complaint (and as further described in her sworn affidavit attached to the pleadings), Melissa Riley explained the plan that Albemarle Public Schools staff developed and presented to her – a plan to instruct students in separate classrooms based on their race and to instruct these segregated classes with

different lessons and discussions. Again, as the Supreme Court has clearly, and very recently in *Vlaming* stated:

> This case comes before us from the dismissal of a complaint (on demurrer and in part on a plea in bar) without any consideration of evidence. Our standard of review requires us to assume as true each of [the Plaintiffs'] factual allegations and any reasonable inferences from those allegations.

*Vlaming*, ___ Va. at ___, ___, ___ (where the Supreme Court also stated that it was "[v]iewing Vlaming's [the plaintiff's] allegations in their most favorable light"). Consequently, given this standard of review, this Court must take the allegations pleaded by the Plaintiffs, including the Albemarle Public Schools' plan for separate classrooms based on the students' race, as true for purposes of our analysis on deciding whether the circuit court erred in dismissing the Parents' lawsuit under the plea in bar (or the demurrer). *Id.* at ___; *see Gray*, 276 Va. at 97; *Massenburg*, 298 Va. at 217.

Without question, eliminating racism is a laudable goal. However, different treatment of students based on race or religion (as the Plaintiff Parents allege to be the case in Albemarle Public Schools) in violation of their rights under the Virginia Constitution does not help stop racism. It helps perpetuate it. As the U.S. Supreme Court has clearly stated, "Eliminating racial discrimination means eliminating all of it." *Fellows of Harvard Coll.*, 143 S. Ct. at 2161. What Albemarle Public Schools' alleged plan for separate classrooms and different treatment based on race does demonstrate – together with Albemarle Public Schools' other conduct, its ARC curriculum, and its alleged encouragement of teachers to treat students differently based on race – is that the Plaintiff Parents here faced a substantial risk that their minor children would be discriminated against and treated differently in the Albemarle Public Schools based on the student's race, religion, or both. Furthermore, the Parents' allegations demonstrate that the Student Plaintiffs faced a substantial risk that they would be compelled to affirm the ARP's

ideological tenets – as L.R. and V.I. went through the eighth grade at Henley Middle School and as P.M. started high school. *See Morgan*, ___ Va. at ___ (where the Supreme Court held, "The homeowners' factual allegations in this case, when assumed to be true, satisfy this standard of likelihood of harm for purposes of standing.").

Based on these allegations of harm and impending harm that are supported by present facts, I would hold that L.R., V.I., and P.M. have alleged sufficient present and impending harms that they have standing to bring a claim seeking declaratory judgment and injunctive relief. *See id.* at __.[44] The circuit court erred in dismissing Plaintiffs' claims early in this case where no full *ore tenus* evidentiary hearing was held (e.g., where there was no taking of live witness testimony that the parties wished to present) – to determine whether these students' constitutional rights and their parents' constitutional rights under the Bill of Rights of the Constitution of Virginia have been violated. *See Vlaming*, ___ Va. at ___, ___ (holding that the circuit court erred when, "[w]ithout hearing any evidence, the circuit court ended this case at its earliest stage by sustaining the School Board's demurrer and granting the School Board's plea in bar"); *Plofchan v. Plofchan*, 299 Va. 534, 548 (2021) ("Taking these allegations as true, as the circuit court was required to do when ruling on a plea in bar without taking evidence, [the plaintiffs] have standing to bring the underlying action.").

In Virginia, it is indisputable that "education is a fundamental right under the Constitution."[45] *Scott v. Commonwealth*, 247 Va. 379, 386 (1994). Parents have a right to make

---

[44] "[S]ince it is clear from the record that plaintiffs [L.R., V.I., and P.M.] do have standing to challenge the [Albemarle Schools' actions], we need not determine whether the remaining plaintiffs have the requisite standing." *Blanton v. Amelia County*, 261 Va. 55, 59 (2001).

[45] Article VIII, § 1 of the Virginia Constitution states, "The General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained."

decisions about their children's education.  *See* Va. Const. art. I, § 11; *L.F. v. Breit*, 285 Va. 163, 182 (2013); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (where the U.S. Supreme Court stated that "the liberty protected by the Due Process Clause includes the right of parents . . . to control the education of their own" (internal quotation omitted)).  Here, Parents allege that even though their children's constitutional rights are being violated by the Albemarle Public Schools, they cannot opt their children out of the ARC program because it is interwoven throughout the curriculum in a variety of classes throughout Albemarle Public Schools.  Although students and their guardian parents cannot handpick a curriculum and demand that the public schools teach it in their child's classes, those parents and students can certainly demand that a public school not teach their children differently based solely on their race or their religion – or otherwise violate their constitutional rights.  Doing so would indeed violate the parents' constitutional rights under the Virginia Constitution.

Given the allegations presented in the pleadings, noted *supra*, I would hold that the circuit court erred in dismissing the Parents' case with prejudice without even holding an *ore tenus* evidentiary hearing to admit evidence and testimony so that the circuit court could weigh all the evidence and determine the truth of these allegations – and thereby also determine whether the Students' and Parents' constitutional rights under the Virginia Constitution have been violated.

### III.  CONCLUSION

For all of the foregoing reasons, I would hold that the circuit court erred when it ended this case at its earliest stage by granting the plea in bar (and by partially sustaining the demurrer) without even taking testimony and evidence *ore tenus*.  Likewise, the majority errs in affirming the circuit court's judgment dismissing the Parents' case on the plea in bar and by also holding

- 99 -

under a right-result-wrong-reason analysis that the circuit court should have dismissed all counts of the Complaint by sustaining the Albemarle Public Schools' demurrer.

Fighting racism is clearly a very worthwhile, laudable goal. Here, however, the Parents have alleged in their pleadings that their children are actually being treated differently based on their race, their religious convictions, and their refusal to say and agree with certain ideological tenets of the ARC curriculum because of their sincerely held beliefs. Such differing treatment, based on the color of their skin and their religious beliefs, if proven to be true, would not only be racist and discriminatory itself, it would also almost certainly violate Article I of the Virginia Constitution. Therefore, for all of these reasons, I would reverse the circuit court's dismissal of the counts of the Complaint alleging discrimination based on race, alleging discrimination based on religious beliefs, and alleging compelled speech, and I would remand the case for a hearing *ore tenus* on the merits of those very serious and well-pled allegations in the Plaintiffs' request for a declaratory judgment and injunction. Because I believe the majority opinion errs in not requiring the circuit court to at least hold such a full-fledged *ore tenus* hearing to consider those allegations of serious constitutional violations (where the circuit court would actually have to take testimony, admit evidence, and then rule on the merits of this litigation), I must dissent.